448 So.2d 984 (1984)
Martin FINE, Petitioner,
v.
George FIRESTONE, Respondent.
No. 64739.
Supreme Court of Florida.
March 27, 1984.
Rehearing Denied April 23, 1984.
*985 Irwin J. Block, Stuart L. Simon and Burt S. Hellman of Fine, Jacobson, Block, Klein, Colan & Simon, and Arthur J. England, Jr. of Steel, Hector & Davis, Miami, for petitioner.
Jim Smith, Atty. Gen., Mitchell D. Franks, Chief Trial Counsel and Eric J. Taylor, Asst. Atty. Gen., Tallahassee, for respondent.
Dennis M. O'Connor, Coral Gables, amicus curiae for Floridians for Tax Relief, Florida Citizens for Tax Relief and Limit Government Committee, George Schulte, Ed Havill and Y.Y. Phillips, Jr.
Bruce Rogow, Fort Lauderdale, amicus curiae for American Civil Liberties Union Foundation of Florida.
Earl B. Hadlow and Robert J. Winicki of Mahoney, Hadlow & Adams, Jacksonville, amicus curiae for Southeastern Legal Foundation.
Scott Carruthers, Asst. Gen. Counsel, Tallahassee, amicus curiae for Florida Educ. Ass'n/United.
Judith A. Brechner, Tallahassee, amicus curiae for Ralph D. Turlington.
Ronald A. Zumbrun, John H. Findley and Joseph E. Maloney, Sacramento, Cal., and James F. Pollack, Coral Gables, amicus curiae for Pacific Legal Foundation.
Robert E. Gibson, Tallahassee, amicus curiae.
Joseph W. Little, Gainsville, amicus curiae.
OVERTON, Justice.
Petitioner, Martin Fine, sought an extraordinary writ from the First District Court of Appeal directing the secretary of state to remove from the 1984 general election ballot a proposed constitutional amendment identified as Citizens' Choice on Government Revenue. In an opinion reported as Fine v. Firestone, 443 So.2d 253 (Fla. 1st DCA 1983), the district court declined to issue the extraordinary writ but certified the following questions to this Court:
WHETHER IN THE CIRCUMSTANCES PRESENTED THE PROPOSED CONSTITUTIONAL AMENDMENT IS SUSCEPTIBLE TO CONSTITUTIONAL CHALLENGE BY PETITION FOR AN EXTRAORDINARY WRIT, AND IF SO:
WHETHER THE PROPOSED REVENUE LIMITATION AMENDMENT INVOLVED IN THIS CASE COMPORTS WITH ARTICLE XI, SECTION 3, FLORIDA CONSTITUTION, AND IF SO:
WHETHER THE PROPOSED REVENUE LIMITATION AMENDMENT INVOLVED IN THIS CASE IS PRESENTLY SUSCEPTIBLE TO A DUE PROCESS CHALLENGE UNDER THE FEDERAL CONSTITUTION.
Id. at 257. We have jurisdiction, article V, section 3(b)(4), Florida Constitution.
In summary, we find that the extraordinary writ of mandamus is a proper means for resolving the strictly legal issue of whether the Citizens' Choice proposal addresses more than one subject in violation of article XI, section 3 of the Florida *986 Constitution. We therefore answer the first certified question in the affirmative.
We hold that the Citizens' Choice proposal clearly violates the single-subject requirement of the Florida Constitution. We find that the proposal includes at least three subjects, each of which affects a separate existing function of government. First, it limits how governments can tax, thereby affecting the general operation of state and local government. Second, it restricts all government user-fee operations, such as garbage collection, water, electric, gas, and transportation services which are paid for by the users of the services. Third, it affects the funding of capital improvements through revenue bonds, which are financed from revenue generated by the capital improvements. Accordingly, the second certified question is answered in the negative.
Having so answered the second certified question, it is unnecessary for this Court to address the third certified question.[1] The reasons for our holdings are fully expressed below.

Factual History
The proposed amendment originated with an initiative petition for a constitutional amendment entitled "Citizens' Choice on Government Revenue." The initiative petition was signed by the requisite number of voters and was approved by the secretary of state for inclusion on the 1984 general election ballot as Amendment One. The ballot summary and full language of the proposed constitutional provision read as follows:
Ballot title and summary:
CITIZENS' CHOICE ON GOVERNMENT REVENUE
Limits the state and each taxing unit to 1980-81 revenue dollars plus ad valorem taxes on subsequent new construction and annual adjustments of two-thirds of the Consumer Price Index percentage change; however, the maximum annual adjustment increase for ad valorem taxes is five percent. Revenue limits may be exceeded only with voter approval, for specified purposes, amounts and periods. Enforcement is by setting aside excess revenue, reduction of rates and taxpayer suits. Includes related provisions.
The following new section is added to Article VII of the Florida Constitution:
CITIZENS' CHOICE ON GOVERNMENT REVENUE:
(a) Revenue received by the state and by each taxing unit for each fiscal period shall be limited to the revenue limit for the preceeding [sic] fiscal period plus the annual adjustment and any ad valorem taxes on improvements due to new construction subject to assessment for the first time.
(b) For purposes of this section:
(1) revenue includes ad valorem taxes, other taxes and all other receipts, but excludes receipts from the United States government and its instrumentalities, bonds issued, loans received and the cost of investments sold. Receipts of agencies and instrumentalities and proprietary and trust funds shall be included in the revenue of the state or other taxing unit as appropriate.
(2) the annual adjustment for each fiscal period shall be the revenue limit of the preceeding [sic] fiscal period times two-thirds of the percentage change in the Consumer Price Index for All Urban Consumers, U.S. City Average, All Items, 1967 = 100, or successor reports, for the preceeding [sic] calendar year, as initially reported by the United States Department of Labor, Bureau of Labor Statistics; however for ad valorem taxes no annual adjustment increase shall exceed five percent of the ad valorem taxes of preceeding [sic] fiscal period.
(3) each fiscal period shall be twelve months[.]

*987 (4) the initial revenue limit, for the first fiscal period beginning after the effective date of this section, shall be calculated by using the revenue in the fiscal period beginning in 1980, plus subsequent changes due to annual adjustments and ad valorem taxes on new construction, as if this section had been in effect.
(c) Revenue collected in excess of a revenue limit shall be placed in escrow until the following fiscal period, in which period it shall be deemed revenue received, and applicable rates shall be reduced in an amount reasonably calculated to comply with the revenue limits of this section.
(d) When authorized by vote of the electors of a taxing jurisdiction:
(1) revenue limits may be exceeded for specified purposes and amounts, for not longer than two fiscal periods;
(2) revenue limits may be exceeded to provide for principal and interest payments on designated bonds for specified purposes.
(3) a taxing unit may use its first fiscal period, in lieu of one beginning in 1980, for determining initial revenue limits.
(e) Revenue limits may be exceeded to the extent necessary to avoid impairment of obligations of contracts and bonds existing on the effective date of this section.
(f) Any taxpayer of the state shall have standing to bring suit to enforce this section and, if successful, shall recover costs and attorney fees from the taxing jurisdiction.
Fine instituted this action claiming that the proposed amendment violates both the single-subject rule of the Florida Constitution and the due process clause of the federal constitution. He sought, in the First District Court of Appeal, to have the amendment removed from the ballot by an extraordinary writ. In denying relief, the district court first held that petitioner's assertions required fact-finding and that there was an available remedy by declaratory judgment or injunction in the circuit court. The district court, however, then proceeded to address the merits of the petition. On the merits, the district court, relying primarily on this Court's decisions in Floridians Against Casino Takeover v. Let's Help Florida, 363 So.2d 337 (Fla. 1978), and Weber v. Smathers, 338 So.2d 819 (Fla. 1976), found that "the proposed amendment in this case contains various elements within the ambit of the single subject of revenue limitation, and that petitioner has not established that the proposal is `clearly and conclusively defective' within the purview of Article XI, Section 3, Florida Constitution." 443 So.2d at 257. The district court also rejected petitioner's contention that the proposal violates the due process clause of the federal constitution. The court then certified the previously quoted questions.

Jurisdiction
The first question is whether an appellate court has jurisdiction to address the constitutionality of the Citizens' Choice proposal in this type of proceeding. We find that mandamus is an appropriate remedy in this case. In our view, the situation presented here is similar to those presented in Republican State Executive Committee v. Graham, 388 So.2d 556 (Fla. 1980), and State ex rel. Citizens Proposition for Tax Relief v. Firestone, 386 So.2d 561 (Fla. 1980), which involved straightforward legal questions which did not require fact-finding. The issue of whether the Citizens' Choice proposal violates the single-subject requirement of article XI, section 3 of the Florida Constitution is, in our view, strictly legal in nature. The resolution of this issue requires no findings of fact. It requires only a construction of the terms of the proposal. Having concluded that only a legal issue is involved, we exercise our discretionary authority to decide the single-subject constitutional issue.

The Single-Subject Requirement of an Initiative Proposal to Revise or Amend the Constitution

The primary question before this Court is whether there is more than one subject *988 contained in the Citizens' Choice proposal. Article XI, section 3 of the Florida Constitution authorizes changes in our constitution by initiative petition and provides that:
[t]he power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment shall embrace but one subject and matter directly connected therewith.

(Emphasis added.) The single-subject requirement in the proviso language of this section is a rule of restraint. It was placed in the constitution by the people to allow the citizens, by initiative petition, to propose and vote on singular changes in the functions of our governmental structure. The initiative petition is one of four methods authorized for amending or revising the state constitution.
Article XI of the Florida Constitution, in sections 1-4, prescribes the procedures for amending or revising the constitution. Section 1 authorizes the legislature, by joint resolution passed by a three-fifths vote of the membership of each house of the legislature, to propose an amendment of a section or a revision of one or more articles, or the whole, of the constitution. Section 2 authorizes a revision commission to meet at specific intervals and present to the electorate a revision of the constitution. Section 4 authorizes the establishment of a constitutional convention which may present to the electorate a revision of the constitution. Only the initiative process in section 3 contains the restrictive language that "any such revision or amendment shall embrace but one subject and matter directly connected therewith."
It is apparent that the authors of article XI realized that the initiative method did not provide a filtering legislative process for the drafting of any specific proposed constitutional amendment or revision. The legislative, revision commission, and constitutional convention processes of sections 1, 2 and 4 all afford an opportunity for public hearing and debate not only on the proposal itself but also in the drafting of any constitutional proposal. That opportunity for input in the drafting of a proposal is not present under the initiative process and this is one of the reasons the initiative process is restricted to single-subject changes in the state constitution. The single-subject requirement in article XI, section 3, mandates that the electorate's attention be directed to a change regarding one specific subject of government to protect against multiple precipitous changes in our state constitution. This requirement avoids voters having to accept part of an initiative proposal which they oppose in order to obtain a change in the constitution which they support. An initiative proposal with multiple subjects, in which the public has had no representative interest in drafting, places voters with different views on the subjects contained in the proposal in the position of having to choose which subject they feel most strongly about.
We recognize that there is a similar one-subject restriction contained in article III, section 6 of the Florida Constitution regarding laws enacted by the legislature. The purpose of this provision is to prohibit the aggregation of dissimilar provisions in one law in order to attract the support of diverse groups to assure its passage. In legislative parlance, article III, section 6, prohibits what is known as "logrolling." See Brown v. Firestone, 382 So.2d 654 (Fla. 1980); Green v. Rawls, 122 So.2d 10 (Fla. 1960). We recognize that we have taken a broad view of this legislative restriction but only to the extent that the contents of the legislation must be reasonably related. See Chenoweth v. Kemp, 396 So.2d 1122 (Fla. 1981); State v. Lee, 356 So.2d 276 (Fla. 1978). We recede from our prior language in Floridians that expressed the view that there is no difference between the legislative one-subject restriction and the initiative constitutional proposal one-subject limitation. We find it is proper to distinguish between the two. First, we find that the language "shall embrace but one subject and matter properly connected therewith" in article III, section 6, regarding statutory change by *989 the legislature is broader than the language "shall embrace but one subject and matter directly connected therewith," in article XI, section 3, regarding constitutional change by initiative. (Emphasis added.) Second, we find that we should take a broader view of the legislative provision because any proposed law must proceed through legislative debate and public hearing. Such a process allows change in the content of any law before its adoption. This process is, in itself, a restriction on the drafting of a proposal which is not applicable to the scheme for constitutional revision or amendment by initiative. Third, and most important, we find that we should require strict compliance with the single-subject rule in the initiative process for constitutional change because our constitution is the basic document that controls our governmental functions, including the adoption of any laws by the legislature.
In our view, the single-subject restraint on constitutional change by initiative proposals is intended to direct the electorate's attention to one change which may affect only one subject and matters directly connected therewith, and that includes an understanding by the electorate of the specific changes in the existing constitution proposed by any initiative proposal.
In Adams v. Gunter, 238 So.2d 824 (Fla. 1970), this Court found, under a more restrictive constitutional provision,[2] that a proposal to create a unicameral legislature violated the single-section requirement of article XI, section 3. Under the prior constitutional provision, the initiative process was limited to the amendment of "any section" of the constitution. After our decision in Adams, the constitutional initiative provision was broadened to allow the revision or amendment of "any portion or portions" of the constitution. In Adams this Court expressed concern that the proposal neither identified the sections amended nor specified how they would be amended. We have the same concerns in this cause.
Although an initiative petition under the present constitution may amend multiple sections of the constitution as long as the proposal contains a single subject, an initiative proposal should identify the articles or sections of the constitution substantially affected. This is necessary for the public to be able to comprehend the contemplated changes in the constitution and to avoid leaving to this Court the responsibility of interpreting the initiative proposal to determine what sections and articles are substantially affected by the proposal. The problem of conflicting provisions resulting from the adoption of an initiative proposal cannot be satisfactorily addressed by the application of the principle of constitutional construction that the most recent amendment necessarily supersedes any existing provisions which are in conflict. We recede from Floridians to the extent that it conflicts with this view. Reliance on the application of this principle of constitutional construction in these circumstances would grant to this Court broad discretionary authority in determining the effect of a proposed amendment or revision on the existing constitution. No official record of legislative history or debate would be available to aid this Court in the construction of an amendment resulting from an initiative proposal. We do not believe it was the intent of the authors of the initiative-amendment provision, nor the intent of the electorate in adopting it, that the Supreme Court should be placed in the position of redrafting substantial portions of the constitution by judicial construction. This, in our view, would be a dangerous precedent.
In Weber v. Smathers, 338 So.2d 819 (Fla. 1976), and Floridians Against Casino Takeover v. Let's Help Florida, 363 So.2d 337 (Fla. 1978), we addressed the issue of whether certain initiative proposals met the *990 one-subject requirement as it is presently written. In Weber we determined that the "Ethics in Government" proposal which set forth the standard of conduct required of government officials and employees, and the people with whom they deal, involved a single subject. The standards of conduct included financial disclosure by public employees, public officials and candidates for such offices, their rights under the public retirement system when found guilty of misconduct, and limitations on lobbyists. We expressly rejected the contention that the proposal conflicted with other constitutional provisions, finding that "the proposed amendment is sufficiently complete within itself, requiring no other amendment to effect its purpose." 338 So.2d at 822. We further found that the provisions were "sufficiently related to withstand an attack that they embrace more than one subject," id., and that the proposal would "not conflict with other articles and sections of the constitution." Id.
In Floridians we held that the legalization of casino gambling, its taxation, and the distribution of the taxes collected, constituted a single subject. In rejecting the assertion that the proposed amendment contained more than one subject, we reaffirmed a part of the test expressed in City of Coral Gables v. Gray, 154 Fla. 881, 19 So.2d 318 (1944), that in determining whether a proposal addresses a single subject the test is whether it "may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme. Unity of object and plan is the universal test... ." Id. at 883-84, 19 So.2d at 320. We also emphasized in Floridians that, under the present constitutional provision, the test should include a determination of whether the proposal affects a function of government as opposed to whether the proposal affects a section of the constitution. We reasoned that the one-subject limitation of "any portion or portions" of the constitution was selected to place a functional as opposed to a locational restraint on the range of authorized amendments. We agree with that language. The significance of the word "function" as used in Floridians was to point out that the one-subject limitation dealt with a logical and natural oneness of purpose, as opposed to the prior limitation on initiative proposals affecting multiple sections of the constitution. In Floridians we also held that the question of whether an initiative proposal conflicted with other articles or sections of the constitution had "no place in assessing the legitimacy of an initiative proposal." 363 So.2d at 341. We recede from that language and find that how an initiative proposal affects other articles or sections of the constitution is an appropriate factor to be considered in determining whether there is more than one subject included in an initiative proposal.
The supporters of the Citizens' Choice proposal contend that all of its provisions deal with government revenue and are of a common and consistent theme. They contend that each provision of the amendment promotes the single object of limiting government revenue in a slightly different way. We reject the contention that the proposal necessarily affects only one function of government and contains only one subject. There is no question but that this proposal addresses at least three subjects which affect separate, distinct functions of the existing governmental structure of Florida, and substantially affects multiple sections and articles of our present constitution which are not in any way identified to the electorate.
First, we find that the proposal clearly restricts all types of taxation utilized for general governmental operations, including ad valorem real property taxes, personal property taxes, sales and use taxes, excise taxes on cigarettes, liquor and gasoline, corporate income taxes, and estate and inheritance taxes. Revenue, for the purposes of the proposed amendment, consists of "ad valorem taxes, other taxes and all other receipts." Tax revenue, as a component of the revenue addressed by the proposal, is restricted by the general limitation placed on yearly revenue changes. The proposal places a cap on revenue by using *991 the revenue received for the fiscal period of 1980-81 as a base and allowing an annual adjustment for each fiscal period equivalent to two-thirds of the percentage change in the Consumer Price Index for the preceding calendar year, but restricting ad valorem tax increases to a maximum of five percent per year. To increase tax revenue beyond this point would require a vote of the people. The vote must be for specific purposes and amounts, and any approved increase can be effective for no longer than two fiscal periods. Some of the sections substantially affected by this limitation on tax revenue for general government operations are article VII, section 1 (taxation, appropriation, and state expenses); article VII, section 5 (estate and inheritance taxes); article VII, section 9 (local taxes); article IX, section 6 (state school fund); article XII, section 9(a) (public education trust fund); and article XII, section 9(c) (motor vehicle gas tax). This list is not all inclusive. The petitioner argues that the limitations on the various types of tax revenue are separate subjects because such limitations affect different services and entities of government. Because we find that the Citizens' Choice proposal contains other distinct subjects, we decline to address this contention.
The second distinct subject which we find in the Citizens' Choice proposal involves the restriction on the operation and expansion of all user-fee services. User-fee services are those services, ordinarily utilities, which are primarily paid for by the users of the services. These include garbage collection, water, electricity, gas, and transportation services. This initiative proposal also affects permitting functions, such as the issuance of building permits, and the collection of fees for services such as recording and court filings. The intent of the proposal is to limit all "receipts of agencies and instrumentalities and proprietary and trust funds," which includes all revenue generated by government-operated utilities and other user-fee services.
It is clear that the Citizens' Choice proposal fails to allow for increased demand on government-owned utilities and other user-fee services resulting from population increases or other causes. The Citizens' Choice proposal would require a vote of the people for specific purposes and amounts in order to address such problems. If there is no corresponding decrease in other revenues, there is no means to adjust for increased demand for these services without a vote of the people. It is a matter of public record that some governmental entities operate electrical plants (36), some operate gas utilities (24), and many more operate water, sewer, transportation, and garbage services. See Electric & Gas Department, Florida Public Service Commission, Directory of Electric & Gas Utilities (1984). All of these services would be substantially affected by this proposal. The proposal limits the expansion or growth of any user-fee service operated by a governmental entity. We conclude that the effect on these types of user-fee services is a separate subject that is readily distinguishable from the subject of taxation for general governmental operations. These subjects clearly involve two separate and distinct functional operations of our government. General tax revenue, utilized for general governmental operations, and user-fee revenue, primarily utilized to fund services received by the paying consumers, do not have a natural relation and connection as component parts or aspects of a single dominant plan or scheme and, therefore, are clearly separate subjects under this proposal.
The third distinct subject which we find in the Citizens' Choice proposal is the substantial effect it has on the constitutional scheme for the funding of capital improvements with revenue bonds. Under article VII of the Florida Constitution, there are a number of provisions which allow governmental entities to finance the construction of capital improvements with funds from government bonds without the necessity of an election. These bonds are generally repaid from revenue generated by the capital improvement rather than from general tax revenue. For example, under article VII, section 10, governmental entities may, *992 without an election, issue revenue bonds to finance capital projects for airports or port facilities. Under article VII, section 11, revenue bonds may be issued without an election to finance state capital projects payable from funds derived from sources other than state tax revenues. Under article VII, section 14, state bonds pledging the full faith and credit of the state may be issued without an election to finance the construction of air and water pollution control and abatement facilities, solid waste disposal facilities, and other water facilities authorized by general law. These bonds are to be payable primarily from all or any part of the revenues derived from the operation of such facilities. Finally, under article VII, section 16, revenue bonds may be issued without an election to finance housing and related facilities, with the bonds being payable from the funds derived from such improvements. The constitutional scheme under these sections generally provides these various governmental entities with the authority to construct capital improvements without having to submit the project to a vote of the people since, in most instances, the full faith and credit of the governmental entity is not pledged to pay off the bonds.
The proponents of the Citizens' Choice amendment confirmed in oral argument that any revenue generated by a capital improvement constructed with revenue bonds would be included in the overall revenue of the governmental entity which constructed the improvement. The result is that any improvement financed with revenue bonds would have to be approved by the people in order to authorize the increase in revenue generated by the improvement if that increase would cause total revenue to exceed the permissible limit. As noted, the present constitutional scheme provides various governmental entities with the authority to construct certain improvements without having to submit the project to a vote of the people. Without question, the Citizens' Choice proposal alters substantially the present constitutionally-established revenue bond funding scheme contained in article VII. We find that this is a distinct subject that is not connected to the limitation on tax revenue for general governmental operations.[3]
Finally, we reject respondent's argument that the severability language contained on the petition form operates to cure any violation of the single-subject requirement. The language reads:
If any portion of this ballot title, summary and amendment is found to be invalid, the remaining portions shall not be invalidated. If this amendment is found to contain multiple subjects, all references to such additional subjects, found after the first subject, shall be invalid, but the remaining portions of the amendment shall not be invalidated.
This language is not part of the amendment and would not appear on the ballot. Further, such language cannot circumvent this Court's responsibility to determine whether the proposed amendment may constitutionally be placed before the voters.

Conclusion
We conclude that the Citizens' Choice proposal contains at least three subjects. It limits the way in which governmental entities can tax; it limits what government can provide in services which are paid for by the users of such services; and it changes how governments can finance the construction of capital improvements with revenue bonds that are paid for from revenue generated by the improvements.
We are mindful that it is not our responsibility to address the wisdom or merit of this proposed initiative amendment and we have not done so. Solely on the basis of the legal issue presented to this Court, we *993 find that the Citizens' Choice proposal is clearly and conclusively defective because it fails to meet the intent and purpose of the single-subject requirement of article XI, section 3 of the Florida Constitution. If the single-subject requirement means anything, it must apply in this instance. The purpose of the single-subject requirement is to allow the citizens to vote on singular changes in our government that are identified in the proposal and to avoid voters having to accept part of a proposal which they oppose in order to obtain a change which they support. The single-subject rule of restraint is a provision "which the people themselves have incorporated in our Constitution to protect it against precipitous and spasmodic changes in the organic law." Adams v. Gunter, 238 So.2d 824, 832 (Fla. 1970) (Thornal, J., concurring). It is our duty to enforce this rule.
For the reasons expressed, we find that mandamus is an appropriate remedy here and that the Citizens' Choice amendment must be removed from the 1984 general election ballot for failure to comply with the single-subject requirement of article XI, section 3 of the Florida Constitution, and, accordingly, we quash the decision of the First District Court of Appeal. Because we believe the secretary of state will comply with this decision, upon remand, we authorize the district court to withhold issuance of the writ of mandamus at this time.
It is so ordered.
ALDERMAN, C.J., and ADKINS and BOYD, JJ., concur.
McDONALD, J., concurs with an opinion, in which ADKINS, J., concurs.
EHRLICH and SHAW, JJ., concur in result only with opinions.
McDONALD, Justice, concurring.
I concur in the majority opinion, but would like to separately express my views, even though they are, for the most part, cumulative.
This petition seeks removal of a proposed constitutional amendment from the November 1984 ballot. The proposed amendment limits the amount of revenue which the state and its taxing units may receive. Opponents of the proposed amendment claim that it violates article XI, section 3 of the state constitution. Article XI, section 3 provides, in pertinent part:
The power to propose the revision or amendment of any portion or portions of this constitution by initiative is reserved to the people, provided that, any such revision or amendment shall embrace but one subject and matter directly connected therewith.

(Emphasis supplied.) The proposed amendment does not conform to the one subject requirement and clearly should be stricken from the ballot.
Prior to its amendment in 1972, article XI, section 3 provided in part: "The power to propose amendments to any section of this constitution by initiative is reserved to the people." In Adams v. Gunter, 238 So.2d 824 (Fla. 1970), the Court analyzed the various ways of amending the constitution as provided in article XI and also analyzed the effect on the constitution of the proposed amendment creating a unicameral legislature. The Court concluded that
the power reserved to the people to amend any section of the Constitution, includes only the power to amend any section in such a manner that such amendment if approved would be complete within itself, relate to one subject and not substantially affect any other section or article of the Constitution or require further amendments to the Constitution to accomplish its purpose.

Id. at 831 (emphasis supplied). The Court noted the work that had been done in order to give the state "a workable, accordant, homogenous and up-to-date" constitution and that helter-skelter amendments would undo that work. Id. at 832.
Six years after Adams, this Court revisited the area of proposed constitutional amendments in Weber v. Smathers, 338 So.2d 819 (Fla. 1976). By that time article *994 XI, section 3 had been amended to read as it presently does. In Weber the Court adopted the "clearly and conclusively defective test." Id. at 821. The Court found that the proposed "Sunshine Amendment" met that test and held, without discussion, that
the provisions of the proposed amendment are sufficiently related to withstand an attack that they embrace more than one subject. Further, the proposed amendment, if adopted, will not conflict with other articles and sections of the Constitution, and the wording that is to appear on the ballot is legally adequate.
Id. at 822 (emphasis supplied). In his concurrence to Weber Justice England went further than the rest of the Court and discussed what, in his opinion, the 1972 amendment of article XI, section 3 meant. Justice Roberts, on the other hand, dissented and lamented the "rapid abandonment of former precedents" which "confuses the law." Id. at 824. He concluded that the authors of the initiative provision and its amendment intended the initiative to be the most restrictive and most difficult method of amending the constitution. Justice Roberts counseled against hasty constitutional amendments and reminded the Court of its responsibility as judicial officers. I heartily concur with him.
In Floridians Against Casino Takeover v. Let's Help Florida, 363 So.2d 337 (Fla. 1978), the Court adopted and expanded upon Justice England's concurrence to Weber. The Court refused to remove the proposed casino gambling amendment from the ballot, finding that the amendment covered only one subject, and, thus, did not constitute "logrolling," the appellants' first argument as to invalidity. As a second ground, the appellants claimed that the proposed amendment also violated article XI, section 3 because it would create inconsistencies and confusion within the constitution.
The Court's response to this second argument has created the current problem by removing any restraints on the one subject requirement. As Justice England recognized and as Justice Roberts prophesied, this Court's discussion and holding on the second point in Floridians has made the constitution "subject to potentially devasting effects from ... initiative petitions having subjects framed as broadly as the mind can devise." Weber, 338 So.2d at 823 (England, J., concurring).
In Floridians the Court stated:
Once the constitutional restraint is perceived to be functional as opposed to locational, substantial effect by the initiative proposal upon any other section or article of the Constitution becomes irrelevant. And, of course, "conflict" with existing articles or sections of the Constitution can afford no logical basis for invalidating an initiative proposal.
363 So.2d at 341 (footnote omitted). The footnote to this quote cites Weber v. Smathers, but ignores a specific holding of that case, i.e., that "the proposed amendment ... will not conflict with other articles and sections of the Constitution." 338 So.2d at 822. Floridians goes on to state:
When a newly adopted amendment does conflict with preexisting constitutional provisions, the new amendment necessarily supersedes the previous provisions.
363 So.2d at 341. If an amendment is specific and well-defined in its scope, there is no problem in ascertaining what it supersedes. Unfortunately, the sweeping language used in Floridians does not take into account a proposed amendment, such as here, which is simply too broad.
The instant proposed amendment's supporters claim that their proposal affects only a single subject, "revenues." Their opponents, however, point out that "revenues" encompasses a multitude of subjects. Included are such things as ad valorem taxes, user fees, proprietary income, sales taxes, corporate income taxes, income from trust funds; in effect, all income from whatever source except as limited by the proposed amendment itself.[1] An examination of the constitution shows that the proposed *995 amendment would have the immediate effect of amending so as to make them ineffective, or repealing sub silencio, at least the following provisions of the constitution:[2] Article VII, sections 1 (taxation, appropriations, state expenses), 9 (local taxes), 10 (pledging credit), 11 (state bonds, revenue bonds), 14 (pollution control and abatement bonds), 15 (scholarship loan bonds), and 16 (housing bonds); article IX, section 6 (state school funds); article X, sections 13 (suits against the state), and 14 (retirement system benefit changes); article XI, section 5 (amendment or revision election); and article XII, sections 9(a) (public education trust fund), 9(c) (second gas tax), 9(d) (motor vehicle licensing to fund schools), 9(e) (debt limitation), and 15 (special district taxes).
Combining multiple propositions into one proposal constitutes "logrolling," which, if our judicial responsibility is to mean anything,[3] we cannot permit. The very broadness of the proposed amendment amounts to logrolling because the electorate cannot know what it is voting on  the amendment's proponents' simplistic explanation reveals only the tip of the iceberg.[4] The ballot must give the electorate fair notice of the proposed amendment being voted on. Askew v. Firestone, 421 So.2d 151 (Fla. 1982). The ballot language in the instant case fails to do that. The very broadness of the proposal makes it impossible to state what it will affect and effect and violates the requirement that proposed amendments embrace only one subject.
The 1972 amendment to article XI, section 3 expanded the scope of initiative amendments from "any section" to "any portion or portions." I do not think, however, that this change evidences the intent of the legislature or of the electorate to give carte blanche to those who pursue this method of amending the constitution. The instant proposal points up the mischief which could be caused by such an interpretation  the lack of specific amendments to specific sections and articles of the constitution would create chaos as to which parts of that document have or have not been affected and in what manner. We clearly should recede from that part of Floridians which states that the effect of a proposed amendment on the existing portions of the constitution cannot be considered as a basis for invalidating an initiative proposal.
Article XI of the Florida Constitution provides multiple ways to amend the constitution. Had the proposal presented here been recommended as a proposal by the legislature, a constitutional revision commission, or an act of a duly called constitutional convention, it might have passed judicial scrutiny. Initiative petitions should be strictly scrutinized to assure that they meet the limitation that "any revision or amendment shall embrace but one subject and matter directly connected therewith."[5] This proposal trespasses on the limitations imposed on initiative amendments and, therefore, must be stricken.
ADKINS, J., concurs.
EHRLICH, Justice, concurring in result only.
Although I concur with the result reached by the majority, and, for the most part, with the rationale supporting that outcome, I am troubled by the semblance of continued vitality surrounding Weber v. Smathers and Floridians Against Casino Takeover v. Let's Help Florida.
As the majority notes, the purpose of the single-subject requirement is to prevent logrolling, pairing a popular measure with *996 an unpopular one in order to enhance the likelihood of passing the less-favored measure. It would be difficult to imagine a better illustration of logrolling than the initiative proposal approved in Floridians. Tying increased funding of education to the casino gambling proposal was unarguably an attempt to enlist the support of those concerned with the quality of education in Florida for a measure inherently unrelated to education. So long as this Court continues to uphold the result in Floridians, it will stand for the proposition that logrolling may be tolerated in a citizens' initiative proposal to amend the constitution.
Furthermore, in holding today that the single-subject requirement of article XI, section 3 is to be strictly applied while seemingly continuing to approve Weber v. Smathers, the majority sends a garbled message to the public. Discussing Weber in Floridians, this Court noted, "The narrow view would have compelled a finding that at least five `subjects' were embraced within the proposal. The broad view accepted, in fact, by the Court led to upholding the proposal as a single subject  `ethics in government.'" 363 So.2d at 340. In light of today's decision, Weber stands condemned by our own analysis. The fact that the "ethics in government" proposal required no amendment of other sections of the constitution must not be seen as curing the failure to strictly comply with the one-subject limitation. Having eviscerated Weber, the Court should expressly recede from it, in order to give the citizens of Florida clear and coherent instructions for utilizing the citizens' initiative to amend the Florida Constitution.
SHAW, Justice, concurring in result only.
Prior to 1972 article XI, section 3, Florida Constitution, provided that the people could amend any section of the constitution by an initiative petition. In Adams v. Gunter, 238 So.2d 824 (Fla. 1970), we concluded that the initiative power included "only the power to amend any section in such a manner that such amendment if approved would be complete within itself, relate to one subject and not substantially affect any other section or article of the Constitution or require further amendments to the Constitution to accomplish its purpose." Id. at 831.
In Weber v. Smathers, 338 So.2d 819 (Fla. 1976), and Floridians Against Casino Takeover v. Let's Help Florida, 363 So.2d 337 (Fla. 1978), we addressed the effect of the 1972 amendment to article XI, section 3, which expanded the scope of initiative petitions by providing that they could be used to revise or amend any portion or portions of the constitution if such revisions or amendments embraced but one subject and matter directly connected therewith. In Weber, the Court was presented with a choice of diametrically opposed views concerning the standard of review to be applied to such citizen initiatives. In his concurring opinion, Justice England took a liberal and expansive view which had the effect of transferring the largest part of the responsibility for analyzing such initiatives to the citizenry and of minimizing the role of the courts in such analysis. In his dissenting opinion, Justice Roberts took a more conservative view which placed greater responsibility on the courts. In Floridians we adopted and expanded the more liberal views expressed in the Weber concurrence. In my opinion, if we were to review the present initiative using the standard of review which we announced in Weber and Floridians, we could only hold that the initiative meets the provisions of article XI, section 3 and affirm the decision of the district court, Fine v. Firestone, 443 So.2d 253 (Fla. 1st DCA 1983).
The standard of review established in Weber and Floridians consisted of ten principles which I summarize as follows:
1. The 1972 amendment enlarged the right to amend or revise the constitution by initiative.
2. The burden is on a challenger to establish that the initiative proposal is clearly and conclusively defective.
3. The one subject limitation places a functional, as opposed to a locational, *997 restraint on the range of authorized amendments.
4. The wisdom of the proposed initiative is not a matter for judicial review.
5. The one subject limitation should be viewed broadly rather than narrowly.
6. A parallel should be drawn between the one subject restraints placed on the citizens' initiative process and the legislative enactment of laws process. More specifically, the judicial gloss placed on legislative enactments which permit widely divergent rights and requirements in statutes covering a single subject are applicable to citizen-initiative amendments or revisions.
7. The quality of the initiative draftmanship is not a matter for judicial review.
8. The substantial effect of the initiative proposal upon any other section or article of the constitution is irrelevant.
9. Conflicts between the initiative and existing articles of the constitution afford no logical basis for invalidating an initiative proposal.
10. When the newly-adopted amendment or revision conflicts with preexisting constitutional provisions, the newly-adopted provisions necessarily supersede the previous provisions.
While the first four principles are appropriate for appellate review of challenged initiatives, they do not furnish answers to the general question of how far the 1972 amendment enlarged the scope of permissible initiatives or the more specific question of what constitutes one subject under article XI, section 3. Principles five through ten, by contrast, are much more specific and result oriented. Their cumulative effect, in my opinion, is to largely nullify the one subject limitation by forswearing appellate review of the very factors which distinguish multi-subject initiatives from one-subject initiatives. In Floridians the initiative to legalize casino gambling and earmark tax proceeds was relatively narrow from a constitutional viewpoint. It could be described as the camel's nose under the tent. By contrast, the present initiative is extremely broad and brings the entire camel into the tent. Dissenting in Floridians, Justice Alderman recognized the significance of the statement that we would view the one-subject limitation broadly and foresaw its future impact.
The majority views the one subject limitation broadly and says that they have applied a "pragmatic and common sense philosophy" in concluding that the proposed amendment possesses the requisite functional unity to pass muster. This view, in my opinion, so dilutes the one subject limitation of Article XI, Section 3, that there is practically no limitation on the scope of an amendment proposed by the initiative process. I fear that what they have done is to "pragmatize" and "common sense" the one subject limitation right out of the constitution. I do not think this is what was intended by the people when they placed this limitation in the constitution.
Floridians, 363 So.2d at 343.
The citizens' initiative is the most restrictive of the four methods for amending or revising the constitution. After the 1972 amendment this Court had the unenviable task of attempting to apply a working definition to the words "one-subject." Weber and Floridians were not cases that highlighted the imprecision of the words as dramatically as does the present case. In announcing that we would view the one-subject limitation broadly rather than narrowly, we failed to appreciate the impreciseness of the words "one-subject" and thus invited initiative petitions which would sweep so broadly as to nullify the limitation. To view these words broadly is to make them more imprecise and to frustrate *998 the necessity, if the limitation is to be implemented, of giving the words meaning.[1]
Principles six through ten compound the difficulties presented by a broad view of the one-subject limitation. Each year, hundreds of laws are passed, amended, or repealed. Amendment or revision of the constitution is a far more serious matter. Suggesting that the two are analogous, as principle six does, is to blur the distinction. Principle seven is also flawed. An ineptly drawn initiative is a legitimate matter for judicial review for three reasons. First, it may be difficult, perhaps impossible, for a court to determine whether such an initiative meets the one-subject limitation. Second, an ineptly drawn initiative may not present the voters with an understandable proposition. Third, if adopted, the amendment or revision may present formidable difficulties to the three branches of government which have to obey it and may have to implement it. Such an "empty vessel," as the majority opinion recognizes, serves to transfer power to the judiciary, for example, which is directly contrary to the underlying purpose of citizen initiatives. This is not to suggest that citizen initiatives should be thrown out because they are not crystal clear or exactingly precise. If challenged, it may be that a contemporary interpretation can be placed on the initiative which preserves its constitutionality and serves to inform both the voters and the branches of government.
Principles eight and nine are closely related. Examination of the initiative to determine its substantial effect and whether it conflicts with existing provisions of the constitution is highly pertinent to the questions of whether it encompasses only one subject and whether its meaning is clear to the citizenry. This does not mean that an initiative is per se unconstitutional because it has a substantial effect and conflicts with preexisting provisions of the constitution. It does mean that when the initiative petition is challenged the judiciary must examine these factors in order to carry out its constitutional duty.
As to principle ten, it may be that a newly adopted amendment, which cannot be reconciled with older provisions of the constitution, will supersede these older provisions. This is not to say, however, that we should simply dismiss the conflict as irrelevant to the question of the one-subject limitation.
In sum, Weber and Floridians attempted to establish a standard of review for citizens' initiatives which facilitated the citizens' right to amend the constitution by initiative proposals. Unfortunately, in our desire not to unnecessarily impede the initiative process, we forswore the full use of relevant factors which would aid us in determining whether the initiative was limited to one subject. We should recede from the unrealistic standard of review in Weber and Floridians.
I see the one-subject limitation on initiative petitions as serving two purposes:
1. Ensuring that initiatives are sufficiently clear so that the reader, whether layman or judge, can understand what it purports to do and perceive its limits.
2. Ensuring that there is a logical and natural unity of purpose in the initiative so that a vote for or against the initiative is an unequivocal expression of approval or disapproval of the entire initiative.
When the two purposes above are examined, I conclude that the initiative fails on both prongs. The limits of the initiative are not clear and the scope of the single word "revenue" is so broad that citizens might well approve of limitations on one source of revenue while contrarily disapproving of limitations on other sources. They might also contrarily approve or disapprove of the methods for overriding the revenue limitations. Thus, on both counts, approval or disapproval of the composite *999 initiative does not disclose the views of the citizenry on any given component. Accordingly, I concur in enjoining the initiative from the November ballot.
The wide sweep of this initiative has revealed the wisdom of the views of Justices Roberts and Alderman in a way that was less apparent in Weber and Floridians. Having wrestled with the issues here, I understand better the views of Justices Terrell and Roberts that "[i]t is hard to amend the Constitution and it ought to be hard," and that the citizens' initiative method of amending the constitution deserves particular care because it does not have the structural safeguards which are built into the other three methods. Weber, 338 So.2d at 824.
On page 990, the majority states that we emphasized in Floridians that the test of the one-subject limitation "should include a determination of whether the proposal affects a function of government as opposed to whether the proposal affects a section of the constitution." I see nothing in Floridians or the constitution to warrant this statement of the test or the other references in the majority opinion which equate "function of government" to one subject.[2] The introduction of the function of government test is dicta which, if followed, will carry us from the one extreme in Floridians of largely nullifying the one subject limitation to the opposite extreme of making the limitation practically insurmountable. The ethics in government amendment which we upheld in Weber would certainly fail the test, assuming, as I believe we can, that ethics in government is applicable to all branches and functions of government. It is primarily for this reason that I concur only in result.
NOTES
[1] Although we do not decide whether the proposed amendment violates the due process provision of the federal constitution, it appears in this instance that mandamus would not be appropriate since an evidentiary hearing would be necessary to properly resolve that issue.
[2] The prior constitutional provision dealing with initiative proposals, article XI, section 3, of the 1968 Constitution provided, in part, "[t]he power to propose amendments to any section of this constitution by initiative is reserved to the people." (Emphasis added.) The present section 3 of article XI provides for revision or amendment of "any portion or portions of this constitution" by initiative. (Emphasis added.)
[3] We note that the Citizens' Choice proposal is not similar to Proposition 13, an amendment to the California Constitution. Proposition 13 limits the amount of any ad valorem tax to one percent of the full cash value of the property taxed. This restriction, which was upheld in Amador Valley Joint Union High School District v. State Board of Equalization, 22 Cal.3d 208, 149 Cal. Rptr. 239, 583 P.2d 1281 (1978), affected only one revenue source. See Lefcoe and Allison, The Legal Aspects of Proposition 13: The Amador Valley Case, 53 S.Cal.L.Rev. 173 (1979).
[1] 1983 Op.Att'y Gen.Fla. 083-64 (Sept. 27, 1983).
[2] The less than immediate effect on other parts of the constitution such as art. I, § 21 (access to courts) and art. IX, § 1 (free public schools), for example, is incalculable. In fact, during oral argument, counsel admitted that he had no idea of what would be the extent of the effects of the proposed amendment, either now or in the future.
[3] See Weber, 338 So.2d at 824 (Roberts, J., dissenting).
[4] As stated in note 2, supra, even the amendment's proponents do not know what the proposed amendment will do.
[5] I feel the Court failed to do this in Weber and Floridians.
[1] The subject of the constitution, for example, might be described as government or political science. If we were faced with an initiative so broadly titled which extensively revised our governmental structure, could we in good conscience hold that the initiative met the one-subject limitation?
[2] See page 986, "each of which affects a separate existing function of government"; page 988, "to propose and vote on singular changes in the functions of our governmental structure"; page 990, "significance of the word `function'"; page 990, "[w]e reject the contention that the proposal necessarily affects only one function of government and contains only one subject"; and page 991, "[t]hese subjects clearly involve two separate and distinct functional operations of our government."