SHAW, J.,
concurring in result only.
The majority opinion holds that the four proposed amendments violate the single subject requirement in various ways[7] and violate the ballot title and summary requirements in sundry other ways.[8] While I disagree with the majority’s reasoning, I nevertheless agree that the amendments are invalid. My quarrel with the amendments is simple and straightforward: I believe that the ballot titles and summaries are fundamentally misleading.
I. FACTS
In 1999, the Florida Civil Rights Initiative (“sponsors”) filed with the Florida Secretary of State (“Secretary”) four initiative petitions seeking to amend the Florida Constitution. The proposed amendments would bar state and local government from promulgating programs that “treat people differently” based on membership in enumerated classes. Three amendments, all of which apply to “race, color, ethnicity, or national origin,” would bar such programs in public education, public employment, and public contracting respectively. The fourth amendment, i.e., the omnibus amendment, applies to “race, *901 sex, color, ethnicity, national origin” and would bar such programs in all three areas, i.e., in public education, public employment, and public contracting. The Secretary submitted the petitions to the Florida Attorney General[9] who petitioned this Court for an advisory opinion concerning the amendments’ validity.[10]
This Court’s inquiry, when assessing the validity of an initiative petition on request of the Attorney General, is limited to two questions: whether the text of the amendment comports with the single subject requirement in article XI, section 3, Florida Constitution, and whether the ballot title and summary comport with the accuracy requirement in section 101.161(1), Florida Statutes (1999). During this pre-election inquiry, the merits of the amendment are not in issue. The Court will declare a proposed amendment invalid only if the record shows that the proposal is clearly and conclusively defective in either of the above areas.[11]
II. THE PRESENT AMENDMENTS
The ballot titles of the first three amendments are identical to one another except for the last word in each, which reads either “EDUCATION,” “EMPLOYMENT,” or “CONTRACTING,” as indicated by the blank space below:
AMENDMENT TO BAR GOVERNMENT FROM TREATING PEOPLE DIFFERENTLY BASED ON RACE IN PUBLIC_
The ballot summaries for the three amendments also are identical except for the words “EDUCATION,” “EMPLOYMENT,” and “CONTRACTING,” as indicated by the blank space below:
Amends Declaration of Rights, Article I of the Florida Constitution, to bar state and local government bodies from treating people differently based on race, col- or, ethnicity, or national origin in the operation of public_, whether the program is called “preferential treatment,” “affirmative action,” or anything else. Does not bar programs that treat people equally without regard to race, color, ethnicity, or national origin. Exempts actions needed for federal funds eligibility.
Similarly, the core provision in the text of each of the three amendments is identical, except for the words “education,” “employment,” and “contracting”:
(1) The state shall not treat persons differently based on race, color, ethnicity, or national origin in the operation of public_
In contrast to the first three amendments, the ballot title for the fourth amendment, i.e., the omnibus amendment, reads as follows:
END GOVERNMENTAL DISCRIMINATION AND PREFERENCES AMENDMENT
The ballot summary for the omnibus amendment utilizes the same “treating people differently” language used in first three summaries and additionally addresses sex:
Amends Declaration or Rights, Article I of the Florida Constitution, to bar state and local government bodies from treating people differently based on race, sex, color, ethnicity, or national origin in public education, employment, or contracting, whether the program is called “preferential treatment,” “affirmative action,” or anything else. Does not bar programs that treat people equally without regard to race, sex, color, ethnicity, or "national origin. Exempts bona fide qualifications based on sex and actions needed for federal funds eligibility.
The core provision in the text of the'omnibus amendment reads as follows:
(1) The state shall not discriminate against, or grant preferential treatment *902 to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.
The gist of the proposed amendments is to bar state and local government from “treating people differently” in public education, public employment, and public contracting based on race, sex, color, ethnicity, or national origin.
III. SINGLE SUBJECT
The Florida Constitution states that an initiative petition must be limited to a single subject:
SECTION 3. Initiative. — The power to propose the revision or amendment of any portion or portions of the constitution by initiative is reserved to the people, provided that, any such revision or amendment, except for those limiting the power of government to raise revenue, shall embrace but one subject and matter directly connected therewith.
Art. XI, § 3, Fla. Const, (emphasis added). The purpose of this requirement is twofold: to insulate the organic law from “precipitous and cataclysmic change,”[12] and to prevent “logrolling.” [13]
The abiding test for evaluating a single-subject challenge to an initiative petition was set forth by this Court in Fine v. Firestone, 448 So.2d 984 (Fla.1984): Fine, 448 So.2d at 990 (quoting City of Coral Gables v. Gray, 154 Fla. 881, 883-84, 19 So.2d 318, 320 (1944)). In brief, the amendment must exhibit “a logical and natural oneness of purpose.” Id.
[I]n determining whether a proposal addresses a single subject the test is whether it “may be logically viewed as haying a natural relation and connection as component parts or aspects of a single dominant plan or scheme. Unity of subject and plan is the universal test.”
The present amendments comport with this test. Although the amendments apply to several areas (i.e., public education, public employment, and public contracting) and various classifications (i.e., race, sex, color, ethnicity, or national origin), these areas and classifications are logically and naturally related to the sponsors’ single dominant scheme to stop state and local government from promulgating programs that expressly promote or favor certain groups or classifications for whatever reason. The enumerated classifications embrace any program that would accomplish that result and are sufficiently interrelated to minimize the danger of logrolling.[14] The amendments would result in a singular change in the organic law of the state, for they would return this area of governmental function to the status quo ante. The state could no longer attempt to adjust for past inequities by sponsoring assistance programs for discrete, historically disadvantaged groups.
IV. BAULOT TITLE AND SUMMARY
Section 101.161, Florida Statutes (1999), requires that all proposed amendments must be accurately represented on the ballot by a title and summary:
101.161 Referenda; ballots.—
(1) Whenever a constitutional amendment or other public measure is submitted to the vote of the people, the substance of such amendment or other public measure shall be printed in clear *903 and unambiguous language on the ballot after the list of candidates, followed by the word “yes” and also by the word “no,” and shall be styled in such a manner that a “yes” vote will indicate approval of the proposal and a “no” vote will indicate rejection. The wording of the substance of the amendment or other public measure and the ballot title to appear on the ballot shall be embodied in the joint resolution, constitutional revision commission proposal, constitutional convention proposal, taxation and budget reform commission proposal, or enabling resolution or ordinance. The substance of the amendment or other 'public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure. The ballot title shall consist of a caption, not exceeding 15 words in length, by tvhich the measure is commonly refetred to or spoken of
§ 101.161(1), Fla. Stat. (1999) (emphasis added). The purpose of this requirement is to ensure that voters have fair notice of the content of the amendment and can cast “an intelligent and informed ballot.”[15] Significantly, both the ballot title and summary are prepared by the amendment’s sponsor.[16]
To conform to section 101.161(1), a ballot summary must state “the chief purpose” of the proposed amendment.[17] In evaluating an amendment’s chief purpose, the Court must look not to subjective criteria espoused by the amendment’s sponsor but to objective criteria inherent in the amendment itself, such as the amendment’s main effect.[18] As noted above, the gist of the present amendments is to bar state and local government from “treating people differently” in the specified areas based on the enumerated classifications. The amendments thus would do two things: They would bar the state from either (1) repressing citizens’ rights, or (2) promoting citizens’ rights, in the specified areas based on membership in the enumerated classes.
As to the first function, i.e., barring government from repressing citizens’ rights, such state action is currently prohibited by the Florida Constitution’s Equal Protection Clause. Article I, section 2, Florida Constitution, expressly states:
Section 2. Basic rights. — All natural persons, female and male alike, are equal before the law and have inalienable rights, among which are the right to enjoy and defend life and liberty, to pursue happiness, to be rewarded.for industry, and to acquire, possess and protect property; except that the ownership, inheritance, disposition and possession of real property by aliens ineligible for citizenship may be regulated or prohibited by law. No person shall be deprived of any right because of race, religion, national origin, or physical disability.
Art. I, § 2, Fla. Const. The Clause logically embraces those areas (i.e., public education, public employment, and public contracting) and classifications (i.e., race, sex, color, ethnicity, or national origin) enumerated in the proposed amendments. The Clause historically has protected against race and sex-based discrimination.[19] Thus, to the extent that the amend *904 ments would protect Floridians from the deprivation of rights based on membership in the enumerated classes, the amendments would simply duplicate the Equal Protection Clause of the Florida Constitution [20] and would have no practical effect— despite language suggesting otherwise.
As to the second function, i.e., barring government from promoting citizens’ rights, this is the true import of these amendments. The constitution currently contains no provision expressly addressing this issue and the amendments thus would have a practical effect in this area, for they would bar government from doing something that it presently can do. In point of fact, state and local governments in Florida have recognized historically founded inequities and have promulgated class-specific programs promoting citizens’ rights in an effort to redress past and present deprivations.[21] One effect — i.e., the intended effect — of the amendments is clear: They would stop government from pursuing any programs that promote the rights of a discrete class (e.g., minorities or women) in the enumerated areas.[22]
Nothing in the ballot titles and summaries notifies the voter of this effect. Just the opposite. By clothing the amendments in traditional equal protection terminology (e.g., “to bar government from treating people differently”; “end governmental discrimination”), the ballot titles and summaries give the illusory impression that the amendments’ main effect would be to protect Floridians from the deprivation of rights. Although the summaries use the phrase “whether the program is called ‘preferential treatment,’ ‘affirmative action,’ or anything else,” this phrase is far from clear and falls short of notifying voters of the actual impact the amendments would have on state programs that recognize and are designed to redress past and present discrimination.[23] Further, this language implies that the amendments would bar only those programs that give ‘preferential treatment to members of the enumerated classes,[24] whereas in fact the amendments would bar all class-specific programs, preferential or not.
This Court in Askew v. Firestone, 421 So.2d 151 (Fla.1982), reviewed a proposed amendment that banned former legislators from lobbying for a two-year period after leaving office unless the legislator disclosed his or her financial interests. Although the ballot summary faithfully tracked the text of the proposed amendment, the summary faded to explain that the amendment would trump an already existing constitutional provision that im *905 posed an absolute two-year ban, regardless of financial disclosure. The Court concluded that the summary was misleading:
The problem ... lies not with what the summary says, but, rather, with what it does not say.
[[Image here]]
If the legislature feels that the present prohibition against appearing before one’s former colleagues is wrong, it is appropriate for that body to pass a joint resolution and to ask the citizens to modify that prohibition. But such a change must stand on its own merits and not be disguised as something else. The purpose of section 101.161 is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment. A proposed amendment cannot fly under false colors; this one does. The burden of informing the public should not fall only on the press and opponents of the measure — the ballot title and summary must do this.
Askew, 421 So.2d at 156 (emphasis added).[25]
In the present case, as in Askew, the main effect of the amendments is not stated clearly- — or even hinted at — anywhere in the ballot language. Rather, the burden of informing voters of the amendments’ true effect is left to the press and opponents of the measures. Many voters— indeed, most voters — thus are left in the dark as to the amendments’ chief purpose and far-ranging effect.[26]
V. CONCLUSION
Based on the foregoing, I conclude that the ballot titles and summaries violate the accuracy requirement set forth in section 101.161(1), Florida Statutes (1999).[27] Rather than frankly notifying voters that the proposed amendments would be used as a “sword” to stop state and local governments from promoting citizens’ rights, the amendments “fly under false colors” and give voters the illusory impression that they would be used as a “shield” to bar government from repressing citizens’ rights.[28] Further, the ballot titles and summaries “hide the ball” as to the amendments’ true effect, giving voters no clue of the impact the amendments actually would have on government programs promoting social harmony and combating discrimination.[29] Under the plain language of the amendments, state and local governments would be powerless to re *906 dress many forms of de facto discrimination, no matter how abject.[30]
While the vague and obfuscating language employed in the ballot titles and summaries might be viewed by some as a deft campaign tactic, such a practice is inimical to the constitutional processes in Florida and is patently impermissible in an initiative petition. A constitutional referendum is not a high stakes poker game where voters must guess the sponsors’ hand by discounting the hype and spin and calculating the odds themselves. Whenever constitutional rights are in issue, accuracy and truthfulness are the hallmarks.[31] The sponsors of an amendment must place all the cards on the table, face up, prior to the election. Each voter is entitled to cast a ballot based on the full truth.
Because the ballot titles and summaries of the proposed amendments are fundamentally misleading, I conclude that the four amendments — as presently drafted— are invalid.

. The majority opinion holds that the omnibus amendment improperly embraces multiple subjects and that all four amendments are defective in the following ways: They fail to identify the other constitutional provisions that they substantially affect; and they functionally affect multiple branches and levels of government.

. The majority opinion holds that the omnibus amendment improperly uses the phrase "bona fide qualifications based on sex” and that all four amendments are defective in the following ways: They improperly use the term "people” in the summary and "persons” in the text; they fail to identify the other constitutional provisions that they affect; and they erroneously imply that the constitution does not currently contain a provision barring discrimination based on the enumerated classifications.

. See § 15.21, Fla.Stat. (1999).

. See § 16.061, Fla.Stat. (1999).

. See Askew v. Firestone, 421 So.2d 151, 154 (Fla.1982).

. In re Advisory Opinion to the Attorney General-Save Our Everglades, 636 So.2d 1336, 1339 (Fla.1994).

. Fine v. Firestone, 448 So.2d 984, 988 (Fla.1984).

. Cf. In re Advisory Opinion to the Attorney General-Restricts Laws Related to Discrimination, 632 So.2d 1018, 1019 (Fla.1994) (striking an amendment that was intended to bar rights or protections for homosexuals and that forbade the passage of laws creating rights or protections based on anything other than “race, color, religion, sex, national origin, age, handicap, ethnic background, marital status, or familial status”; “marital status" was defined to include only opposite-sex marriages).

. Advisory Opinion to the Attorney General re Term Limits Pledge, 718 So.2d 798, 803 (Fla.1998).

. See § 101.161(2), Fla.Stat. (1999).

. See § 101.161(1), Fla.Stat. (1999) ("The substance of the amendment or other public measure shall be an explanatory statement, not exceeding 75 words in length, of the chief purpose of the measure.” (Emphasis added)).

. See, e.g., Evans v. Firestone, 457 So.2d 1351, 1355 (Fla.1984) ("The ballot summary should tell the voter the legal effect of the amendment ...." (emphasis added)); Askew v. Firestone, 421 So.2d at 151, 156 (Fla.1982) ("The purpose of section 101.161 is to assure that the electorate is advised of the true meaning, and ramifications, of an amendment.” (Emphasis added)).

. Cf. United States v. Virginia, 518 U.S. 515, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996) (addressing sex-based discrimination at Virgi *904 nia’s publicly-operated military academy, Virginia Military Institute, under the federal Equal Protection Clause); Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (addressing race-based discrimination in public schools under the federal Equal Protection Clause).

. The amendments, however, could have a confusing effect on the Equal Protection Clause by implying that "religion” and “physical disability,” which are denoted in the constitution but not in the present amendments, are entitled to less protection than the other classes, which are denoted in both the constitution and the present amendments.

. See, e.g., §§ 287.0931-.0947, Fla.Stat. (1999) (delineating minority business enterprise programs); §§ 288.702-.714, Fla.Stat. (1999) (setting forth the Florida Small Minority Business Assistance Act of 1985); §§ 337.125 — .139, Fla.Stat. (1999) (delineating criteria for socially and economically disadvantaged business enterprises and efforts to encourage the awarding contracts to disadvantaged business enterprises).

. Under the plain language of the amendments, state and local governments could pursue only those programs that are mandated by court order or consent decree or that are necessary to maintain federal funding for the state.

. The amendments on their face would bar any race or sex-based program in the enumerated areas. This would include enrichment, outreach, and mentoring programs as well as traditional affirmative action programs involving percentages, timetables, and goals.

. The ballot title of the omnibus amendment states: "END GOVERNMENTAL ... PREFERENCES ...”

. See also Wadhams v. Board of County Comm'rs, 567 So.2d 414 (Fla.1990) (striking as misleading a county charter amendment that called for meetings by the Charter Review Board every four years, where the ballot language failed to inform voters that the amendment would supersede an existing charter provision that allowed unlimited meetings).

. See Wadhams, 567 So.2d at 414 ("The [Commissioners argue] that the majority in the decision below correctly concluded that there was no reason to invalidate the amendment ] based on voter confusion because the voters were afforded ample opportunity to become informed on the issue before the election by public hearings, advance publication of the proposal, and media publicity. We reject this argument.”); see also James Bacchus, Legislative Efforts to Amend the Florida Constitution: The Implications of Smathers v. Smith, 5 Fla. St. U.L.Rev. 747, 802 (1977) ("It is hardly necessary to document the conclusion that a constitution which relies exclusively on legislative journals and legal advertisements to publicize proposed constitutional amendments guarantees little in the way of actual notice to a vast majority of the electorate.”).

. The amendments also contain several technical faults: The summaries use the term "people” whereas the texts use the term "persons”; and the summary to the omnibus amendment uses the phrase "bona fide qualifications based on sex” without clarification.

. The ballot title of the omnibus amendment states: "END GOVERNMENTAL DISCRIMINATION ...”

. For instance, state and local governments would be barred from undertaking class-specific programs intended to promote full use of community resources, to preempt expensive legal challenges, or to defuse tension or unrest within a community.

. As noted above, under the plain language of the amendments, state and local governments could pursue class-specific programs only when mandated by court order or consent decree or when necessary to preserve federal funding for the state.

. See generally Crawford v. Gilchrist, 64 Fla. 41, 54, 59 So. 963, 968 (1912) (noting that the "proposal of amendments to the Constitution is a highly important function of government, that should be performed with the greatest certainty, efficiency, care and deliberation”).