# Supreme Court of Florida

———————

No. SC2023-0682

———————

## ADVISORY OPINION TO THE ATTORNEY GENERAL RE: ADULT PERSONAL USE OF MARIJUANA.

April 1, 2024

GROSSHANS, J.

A ballot initiative to legalize the recreational use of marijuana under Florida law obtained the required number of signatures to trigger mandatory judicial review of the initiative's validity. Our role is narrow—we assess only whether the amendment conforms to the constitutionally mandated single-subject requirement, whether the ballot summary meets the statutory standard for clarity, and whether the amendment is facially invalid under the federal constitution. In light of those limited considerations, we approve the proposed amendment for placement on the ballot.

I

The Attorney General requested an advisory opinion on the validity of the "Adult Personal Use of Marijuana" initiative.[1] Proposing to modify article X, section 29 of the Florida Constitution, the amendment would legalize personal use of marijuana by adults under state law. The text of the proposed amendment is as follows:

> SECTION 29. ~~Medical m~~Marijuana production, possession and use.—
>
> (a) PUBLIC POLICY.
>
> [No changes to (a)(1)-(3).]
>
> (4) The non-medical personal use of marijuana products and marijuana accessories by an adult, as defined below, in compliance with this section is not subject to any criminal or civil liability or sanctions under Florida Law.
>
> (5) Medical Marijuana Treatment Centers, and other entities licensed as provided below, are allowed to acquire, cultivate, process, manufacture, sell, and distribute marijuana products and marijuana accessories to adults for personal use upon the Effective Date provided below. A Medical Marijuana Treatment Center, or other state licensed entity, including its agents and employees, acting in accordance with this section as it relates to acquiring, cultivating, processing, manufacturing, selling, and distributing marijuana products and marijuana accessories to adults for

---

1. We have mandatory jurisdiction. *See* art. IV, § 10; art. V, § 3(b)(10), Fla. Const.

personal use shall not be subject to criminal or civil liability or sanctions under Florida law.

(b) DEFINITIONS.  For purposes of this section, the following words and terms shall have the following meanings:

[No changes to (b)(1)-(10).]

(11) "Marijuana accessories" means any equipment, product, or material of any kind that are used for inhaling, ingesting, topically applying, or otherwise introducing marijuana products into the human body for personal use.

(12) "Marijuana products" means marijuana or goods containing marijuana.

(13) "Personal use" means the possession, purchase, or use of marijuana products or marijuana accessories by an adult 21 years of age or older for non-medical personal consumption by smoking, ingestion, or otherwise.  An adult need not be a qualifying patient in order to purchase marijuana products or marijuana accessories for personal use from a Medical Marijuana Treatment Center.  An individual's possession of marijuana for personal use shall not exceed 3.0 ounces of marijuana except that not more than five grams of marijuana may be in the form of concentrate.

(c) LIMITATIONS.

[No changes to (c)(1).]

(2) Nothing in this section shall affect or repeal laws relating to non-medical use, possession, production, or sale of marijuana.

(2) Nothing in this amendment prohibits the Legislature from enacting laws that are consistent with this amendment.

[No changes to (c)(3)-(4).]

(5) Nothing in this section changes federal law or requires the violation of federal law or purports to give immunity under federal law.

[No changes to (c)(6)-(8).]

[No changes to (d).]

(e) LEGISLATION.  Nothing in this section shall limit the legislature from enacting laws consistent with this section.  The legislature may provide for the licensure of entities that are not Medical Marijuana Treatment Centers to acquire, cultivate, possess, process, transfer, transport, sell, and distribute marijuana products and marijuana accessories for personal use by adults.

[No changes to (f).]

(g) EFFECTIVE DATE.  This amendment shall become effective six (6) months after approval by the voters.

In describing this amendment to the voters, the ballot summary states:

Allows adults 21 years or older to possess, purchase, or use marijuana products and marijuana accessories for non-medical personal consumption by smoking, ingestion, or otherwise; allows Medical Marijuana Treatment Centers, and other state licensed entities, to acquire, cultivate, process, manufacture, sell, and distribute such products and accessories.  Applies to Florida law; does not change, or immunize violations of,

federal law. Establishes possession limits for personal use. Allows consistent legislation. Defines terms. Provides effective date.

The Attorney General and two interested parties filed briefs in opposition to the initiative, arguing that the ballot summary fails statutory clarity rules. One opponent also argues that the proposed amendment does not meet the single-subject requirement, and another raises Supremacy Clause concerns. *See* art. VI, cl. 2, U.S. Const. Disagreeing with these challenges, the Sponsor and three additional interested parties filed briefs in support of the initiative.

## II

Without regard to the merits or wisdom of the initiative, our review is confined to three issues. *See* § 16.061, Fla. Stat. (2023). We ask "(1) whether the proposed amendment itself satisfies the single-subject requirement of article XI, section 3, of the Florida Constitution; and (2) whether the ballot title and summary satisfy the [clarity] requirements of section 101.161(1), Florida Statutes." *Advisory Op. to Att'y Gen. re All Voters Vote in Primary Elections for State Legislature, Governor, & Cabinet* (*All Voters Vote*), 291 So. 3d 901, 904 (Fla. 2020). In carrying out this limited inquiry, we reject a proposal if it is shown to be "clearly and conclusively defective."

*Advisory Op. to Att'y Gen. re Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing, & Other Restrictions* (*Recreational Marijuana II*), 320 So. 3d 657, 667 (Fla. 2021) (quoting *Advisory Op. to Att'y Gen. re Amend. to Bar Gov't from Treating People Differently Based on Race in Pub. Educ.*, 778 So. 2d 888, 891 (Fla. 2000)).  And by statute, as recently amended, we are also to advise "whether the proposed amendment is facially invalid under the United States Constitution."  Ch. 2020-15, § 2, Laws of Fla. (amending § 16.061(1), Fla. Stat.).

## A

The Florida Constitution requires that an amendment proposed by initiative "embrace but one subject and matter directly connected therewith."  Art. XI, § 3, Fla. Const.[2]  Indeed, "[t]he single-subject requirement in article XI, section 3, mandates that the electorate's attention be directed to a change regarding one specific subject of government to protect against multiple

---

2.  Of the various methods for amending or revising the Florida Constitution, only the initiative process contains this single-subject requirement.  *See* art. XI, §§ 1-4, 6, Fla. Const.

- 6 -

precipitous changes in our state constitution." *Fine v. Firestone*,

448 So. 2d 984, 988 (Fla. 1984).

We have interpreted this text to require that an initiative focus

on a single dominant plan or scheme under which all components

have a natural and logical connection. *See All Voters Vote*, 291 So.

3d at 905 (characterizing the test as "oneness of purpose"); *see also*

*Advisory Op. to Att'y Gen. re Water & Land Conservation—Dedicates*

*Funds to Acquire & Restore Fla. Conservation & Recreation Lands*,

123 So. 3d 47, 50-51 (Fla. 2013).[3] This ensures that the initiative

does not engage in logrolling, a practice wherein unrelated matters

are combined into a single initiative "in order to aggregate votes or

secure approval of an otherwise unpopular issue." *In re Advisory*

*Op. to Att'y Gen.—Save Our Everglades*, 636 So. 2d 1336, 1339 (Fla.

1994). And this makes sense, since the initiative process lacks the

---

3. One opponent argues that the "oneness of purpose" test departs from the constitutional text adopted by voters in 1972. Justice Francis also argues that our precedent on the single-subject requirement lacks textual support and would recede from those cases. However, as demonstrated in my concurring opinion, a closer analysis of the provision's text would not compel a different result in this case. *See* concurring op. at 24 (Grosshans, J.). Moreover, we do not find that the opponents, or Justice Francis in her dissent, have demonstrated clear error, a threshold requirement to support receding from precedent.

legislative filtering, public hearing, and policy debate that are inherently part of the other amendment processes. *Id.*

One opponent argues that the proposed amendment violates the single-subject requirement because it both decriminalizes and commercializes recreational marijuana. Justice Francis accepts this argument. We, however, disagree. Allowing businesses to distribute personal-use marijuana, and authorizing individuals to possess it, are logically and naturally related as part of a dominant plan or scheme. Legalization of marijuana presumes the product will be available for the consumer. Likewise, the sale of personal-use marijuana cannot be reasonably undertaken while possession is criminalized. Selling and possessing marijuana appear, for better or worse, directly connected, and we cannot say that an amendment addressing both components violates the single-subject requirement.

Our medical marijuana decision in 2015 reinforces this analysis. *See Advisory Op. to Att'y Gen. re Use of Marijuana for Debilitating Med. Conditions* (*Medical Marijuana II*), 181 So. 3d 471 (Fla. 2015). There, the proposed amendment allowed the use of medical marijuana, removed state penalties and liability for such

use, established the distribution of marijuana through qualified providers, and gave the Department of Health a supervisory role. *See id.* at 477. We held that those provisions satisfied the "directly connected" requirement by being logically unified. *Id.* The provisions in *Medical Marijuana II* on use and legalization are similar to the sale and possession components of the proposed amendment in this case. If anything, the connection here is even more direct.[4]

Accordingly, based on the analysis above—including our discussion of the factually similar *Medical Marijuana II* case—we conclude that the proposed amendment complies with the single-subject requirement in article XI, section 3 of the Florida Constitution.

---

4. The Florida Chamber of Commerce also argues that the amendment substantially alters or performs the functions of multiple branches of state government. We reject this argument as well and do not find that the amendment substantially alters the duties assigned to the branches. *See Medical Marijuana II*, 181 So. 3d at 477-78 (finding a similar proposed amendment to legalize medical marijuana did not "substantially alter" the functions of multiple branches even though multiple branches were required to comply with the provision).

Having decided that the proposed amendment meets the constitution's single-subject requirement, we now turn to the statutory directive. An initiative's ballot summary must be seventy-five words or less, must "be printed in clear and unambiguous language on the ballot," and must "be an explanatory statement . . . of the chief purpose of the measure." § 101.161(1), Fla. Stat. The ballot title is limited to fifteen words and "shall consist of a caption . . . by which the measure is commonly referred to or spoken of." *Id.* "The purpose of these [statutory] requirements is 'to provide fair notice of the content of the proposed amendment so that the voter will not be misled as to its purpose, and can cast an intelligent and informed ballot.' " *Recreational Marijuana II*, 320 So. 3d at 667 (alteration in original) (quoting *Medical Marijuana II*, 181 So. 3d at 478). In assessing a ballot summary for clarity under section 101.161(1), "the Court must consider two questions: '(1) whether the ballot title and summary . . . fairly inform the voter of the chief purpose of the amendment; and (2) whether the language of the title and the summary, as written, misleads the public.' " *Advisory Op. to Att'y Gen. re Prohibits Possession of Defined Assault*

*Weapons* (*Assault Weapons*), 296 So. 3d 376, 381 (Fla. 2020) (omission in original) (citation omitted). "Ballot language may be clearly and conclusively defective either in an affirmative sense, because it misleads the voters as to the material effects of the amendment, or in a negative sense by failing to inform the voters of those material effects." *Id.* (citation omitted).

Opponents argue the ballot summary is misleading because it implies that there are already other state-licensed entities ready to engage in the sale of recreational marijuana, or that the amendment itself licenses these entities. The opponents contend that the word "allow" is an inaccurate description of the amendment's scope, as the Legislature would have to license other entities in the future. Thus, say the opponents, it is overtly misleading to state that the amendment "allows" other entities to enter the market, when in fact the Legislature must first authorize them to do so.

We reject this argument. To "allow" means to "permit the presence of" or to "let . . . happen." *American Heritage Dictionary of the English Language* 48 (5th ed. 2011). The most natural reading of the word "allow" suggests that other entities will be permitted to

enter the market, subject to a state-licensing process. Licensing is a commonly understood activity of government agencies. Voters are familiar with obtaining other licenses from the state, such as a driver's or contractor's license. We do not believe the summary would confuse a voter into thinking that the Legislature is required to authorize additional licenses or that the amendment itself establishes a licensing scheme.[5] It is therefore fair to say that the amendment "allows" additional licensure but does not mandate it.

Nor do we find that a reasonable voter would believe that there are other entities already in existence and licensed to distribute personal-use marijuana, as this activity is currently illegal. The summary does not imply that these entities already exist, but instead properly informs the voter that the market could be expanded, and state licensing will be a prerequisite to that expansion. Thus, we disagree with Justice Sasso's position that the

---

5. By contrast, different language has been utilized when describing an amendment's specific licensing scheme. Notably, the successful ballot summary in *Medical Marijuana II* stated, "The Department of Health *shall* register and regulate centers that produce and distribute marijuana for medical purposes and *shall* issue identification cards to patients and caregivers." 181 So. 3d at 476 (emphasis added).

ballot summary inaccurately signals to the voters that the amendment itself creates a specific noncontingent right in favor of "other state licensed entities" to immediately enter the cannabis market. *See* dissenting op. at 43-44 (Sasso, J.).

By its plain words, the amendment will immediately allow a Medical Marijuana Treatment Center (MMTC)—an entity already licensed to sell medical marijuana—to distribute cannabis for personal use. However, the summary does not suggest that other entities may automatically enter the recreational market without first obtaining a license. Instead, consistent with the ballot summary's terms, the amendment "allows"—in other words, permits the presence of—other licensed entities, provided that the Legislature first creates an underlying licensing scheme for them. That is, once other entities are properly licensed, they can distribute cannabis for personal use, just like MMTCs can.

The opponents' other clarity arguments fare no better. For example, the summary is not misleading for failure to warn that the amendment only covers Florida law and not federal law. Rather, it follows the federal-law-effects "roadmap" first laid out in the *Medical Marijuana* cases. *See Advisory Op. to Att'y Gen. re Adult Use of*

*Marijuana* (*Recreational Marijuana I*), 315 So. 3d 1176, 1181-82 (Fla. 2021).  In *Recreational Marijuana I*, we offered examples of language that would not be misleading: a summary stating that nothing in the amendment "g[a]ve immunity under federal law," that it "[a]pplie[d] only to Florida law," and that it "[did] not immunize violations of federal law."  *Id.* (several alterations in original) (citations omitted).  Consistent with that language, the summary here states that the amendment "[a]pplies to Florida law; does not change, or immunize violations of, federal law."[6]  Nor does the summary fail to state the amendment's chief purpose: it clearly states that the amendment legalizes adult personal possession and use of marijuana as a matter of Florida law.

The summary does not mislead in stating that the amendment "[e]stablishes possession limits for personal use."  The summary signals that the amendment sets a limit on the immunity it grants under state law.  And the amendment does exactly that: in the

---

6. Justice Sasso's dissent also concludes that the summary misleads by saying that the amendment allows for personal consumption of marijuana by adults.  *See* dissenting op. at 45-46 (Sasso, J.).  Quite simply, we think this view is hard to square with our *Medical Marijuana* precedent as detailed above.

definitions section, the amendment describes "personal use" and notes that "personal use" of marijuana "shall not exceed 3.0 ounces of marijuana except that not more than five grams of marijuana may be in the form of concentrate."

Finally, we note that the amendment leaves untouched the Department of Health's existing authority to "issue reasonable regulations necessary for the implementation and enforcement of this section." *See* art. X, § 29(d), Fla. Const. Moreover, the amendment specifies that "[n]othing in this amendment prohibits the Legislature from enacting laws that are consistent with this amendment." *See* art. X, § 29(c)(2), Fla. Const. Consequently, the Department and the Legislature maintain the authority to regulate MMTCs and any additional state-licensed entities. Therefore, we disagree with the Attorney General's argument that the summary is deficient for failing to mention "a gap" during which MMTCs would supposedly be able to sell recreational marijuana without any regulations.

A "ballot summary need not (and because of the statutory word limit, often cannot) explain 'at great and undue length' the complete details of a proposed amendment, and some onus falls

upon voters to educate themselves about the substance of the proposed amendment." *Advisory Op. to Att'y Gen. re Standards for Establishing Legis. Dist. Boundaries*, 2 So. 3d 175, 186 (Fla. 2009) (quoting *Advisory Op. to Att'y Gen. re Right to Treatment & Rehab. for Non-Violent Drug Offenses*, 818 So. 2d 491, 498 (Fla. 2002)). Based on the reasoning above, we find that the summary is not misleading and meets the statutory clarity standards.

C

A recent amendment to section 16.061 requires the Attorney General's request for an advisory opinion include the question "whether the proposed amendment is facially invalid under the United States Constitution." One opponent argues that the proposed amendment is preempted by the federal Controlled Substances Act and, under the Supremacy Clause, the proposal is therefore facially invalid. Assuming that preemption is an appropriate consideration for this Court in assessing facial validity,[7]

---

7. As a threshold issue, no one has briefed whether section 16.061 uses the phrase "invalid under the United States Constitution" to include any proposed amendment that would be preempted by an act of Congress or if that phrase should instead be interpreted to apply only if a proposed amendment is in conflict with a substantive provision of the United States Constitution.

we reject the opponent's argument.  In order for a facial challenge to succeed, we must find that a law would be unconstitutional in *all* of its applications.  *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008).  We decline to make that broad finding here.  A detailed analysis of the potential conflict between sections of this amendment and federal law is a task far afield from the core purpose of this advisory proceeding under the Florida Constitution.  *See id.* at 450 ("Exercising judicial restraint in a facial challenge 'frees the Court not only from unnecessary pronouncement on constitutional issues, but also from premature interpretations . . . .' " (quoting *United States v. Raines*, 362 U.S. 17, 22 (1960))).

## III

For these reasons, we conclude that the ballot summary and amendment comply with the requirements imposed by article XI, section 3 of the Florida Constitution and section 101.161(1) of the Florida Statutes.  We therefore approve the proposed amendment for placement on the ballot.  No rehearing will be permitted.

It is so ordered.

CANADY, LABARGA, and COURIEL, JJ., concur.
MUÑIZ, C.J., concurs with an opinion, in which CANADY, J., concurs.
GROSSHANS, J., concurs with an opinion.
FRANCIS, J., dissents with an opinion.
SASSO, J., dissents with an opinion.

MUÑIZ, C.J., concurring.

I fully concur in the majority opinion, but I write briefly to address the current version of section 16.061, Florida Statutes. That law has long required the Attorney General to seek an advisory opinion from this Court determining a proposed amendment's compliance with the single-subject and ballot clarity requirements. As of 2020, section 16.061 also requires the Attorney General to ask "whether the proposed amendment is facially invalid under the United States Constitution." Ch. 2020-15, § 2, Laws of Fla.

In a future case, our Court would benefit from briefing by interested parties on the meaning and legal effects of this provision. What provisions of the United States Constitution does it encompass? Does the provision sweep so broadly as to include proposed amendments that are preempted by a federal law or regulation and therefore "invalid" under the Supremacy Clause? Would a reasonable reader of the provision understand it to require

this Court to take up potentially complicated, wide-ranging questions of federal law in this non-adversarial, pre-enactment proceeding?

More fundamentally, what would be the legal consequence if this Court were to deem a proposed amendment "facially invalid under the United States Constitution"? Is the assumption that the Court would disapprove the proposal from appearing on the ballot? *Cf. Ray v. Mortham*, 742 So. 2d 1276, 1284 (Fla. 1999) ("[W]hen our 'advisory' opinions conclude that there is a defect in the ballot title and summary or a violation of the single-subject requirement, the effect of our 'advice' is the removal of the amendment from the ballot."). Is that what the Legislature should be understood to have mandated? If so, does the Legislature have the authority to limit the substance of proposed amendments beyond what is contemplated in article XI, section 3 of our state constitution?

Eventually a case will come along where the answers to these questions could affect the outcome. Thorough and thoughtful briefing from the parties will help the Court get it right.

CANADY, J., concurs.

- 19 -

GROSSHANS, J., concurring.

I write separately from the majority opinion to address an opponent's argument on the single-subject requirement. That opponent argues—and Justice Francis agrees—that our jurisprudence on this requirement is flawed and urges us to recede from it. Though I have some misgivings about the phrasing of one of our tests to determine single-subject compliance, I do not think that the opponent has demonstrated clear error—a requirement under our stare-decisis analysis. *See State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020).

Our approach to constitutional interpretation stresses that the text is supreme. *See Advisory Op. to Governor re Implementation of Amend. 4, The Voting Restoration Amend.*, 288 So. 3d 1070, 1078 (Fla. 2020). Given this emphasis, we search for the ordinary meaning of the text at the time the voters approved the constitutional change. *Id.* Indeed, "[e]very word employed in the constitution is to be expounded in its plain, obvious, and common sense, unless the context furnishes some ground to control, qualify, or enlarge it." *Id.* (quoting Joseph Story, *Commentaries on the Constitution of the United States* 157-58 (1833)); *see also Israel*

*v. DeSantis*, 269 So. 3d 491, 496 (Fla. 2019) ("[U]nless the text of a constitution suggests that a technical meaning is intended, words used in the constitution should be given their usual and ordinary meaning . . . ." (alteration in original)). To discern the objective meaning of the text, we routinely consult dictionaries. *See City of Tallahassee v. Fla. Police Benevolent Ass'n, Inc.*, 375 So. 3d 178, 184 (Fla. 2023) (dictionaries are often the best evidence of ordinary and commonly accepted meanings of words at the time they were written).

Here, the relevant text says that a proposed amendment must "embrace but one *subject* and matter *directly connected therewith.*" Art. XI, § 3, Fla. Const. (emphasis added). "Subject" is defined as a "topic." *Subject*, *American Heritage Dictionary of the English Language* 1282 (1969 ed.). And more specifically, as it relates to laws, "subject" refers to "[t]he matter of public or private concern for which law is enacted." *Subject*, *Black's Law Dictionary* 1594 (4th ed. 1968). The phrase "directly connected therewith" also does significant work in this provision. When Florida voters added the single-subject requirement in 1972, "direct" could be defined as "characterized by close logical, causal, or consequential

- 21 -

relationship"; "natural, straightforward." *Direct, Webster's Seventh New Collegiate Dictionary* 235 (1971 ed.); *see also Direct, American Heritage Dictionary of the English Language* 373 (1969 ed.) (defining "direct" as "[w]ithout intervening persons, conditions, or agencies; immediate"). Moreover, the word "connected" conveyed a sense of being "united" or "related." *Connected, American Heritage Dictionary of the English Language* 282 (1969 ed.); *see also Connect, Webster's Seventh New Collegiate Dictionary* 176 (1971 ed.) ("to have a relationship").

In light of these era-appropriate dictionary definitions and consistent with the text's immediate context, a common-sense understanding of this text is that all aspects of the proposed amendment must be logically, closely related and share a natural unity or dependency in addressing a singular matter of public concern. However, in applying these definitions, jurists could easily reach different views on how terms like "logically related" or "natural unity" apply in a given case or how immediate and close the connection must be.[8]

---

8. In arguing that our jurisprudence on the single-subject provision is wrong, Justice Francis stresses that this "requirement's

Not relying on definitions like the ones outlined above, our case law sometimes asks whether the proposed amendment has "oneness of purpose," a test which does not appear anchored to the text of the constitution.[9] I agree with the opponent that this term is imprecise. Nevertheless, despite employing this phrase, we have

---

clear constitutional function [is] restraint." Dissenting op. at 34 (Francis, J.). However, that restraining function does not require us to scour the relevant dictionaries in search of the most restrictive meanings for the terms in article XI, section 3's text. Take "directly" as an example. I offered definitions that are not as restrictive as the one advanced by Justice Francis. I do not find those definitions inconsistent with a restraining function—even though such definitions might allow some "daylight" between the subject and the matter. *See id.* at 26.

9. As early as 1978, we largely relied upon *City of Coral Gables v. Gray*, 19 So. 2d 318, 320 (Fla. 1944), to support our "oneness of purpose" approach to the single-subject clause in article XI, section 3. *See Floridians Against Casino Takeover v. Let's Help Fla.*, 363 So. 2d 337, 339 (Fla. 1978). However, *Coral Gables* interpreted an entirely different provision of a previous constitution that read, "The proposed amendments shall be so submitted as to enable the electors to vote on each amendment separately." 19 So. 2d at 320; *see Floridians*, 363 So. 2d at 339. Nevertheless, our jurisprudence has continued to depend upon that phraseology when analyzing the single-subject provision. *See, e.g., Fine v. Firestone*, 448 So. 2d 984, 990 (Fla. 1984); *Advisory Op. to Att'y Gen.—Ltd. Pol. Terms in Certain Elective Offs.*, 592 So. 2d 225, 227 (Fla. 1991); *Advisory Op. to Att'y Gen. re Prohibiting State Spending for Experimentation that Involves the Destruction of a Live Hum. Embryo*, 959 So. 2d 210, 213 (Fla. 2007); *Advisory Op. to Att'y Gen. re All Voters Vote in Primary Elections for State Legislature, Governor, & Cabinet*, 291 So. 3d 901, 905 (Fla. 2020).

consistently asked if the elements of an amendment "may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme." *Advisory Op. to Att'y Gen. re Water & Land Conservation—Dedicates Funds to Acquire & Restore Fla. Conservation & Recreation Lands*, 123 So. 3d 47, 51 (Fla. 2013) (citation omitted); *Advisory Op. to Att'y Gen. re All Voters Vote in Primary Elections for State Legislature, Governor, & Cabinet* (*All Voters Vote*), 291 So. 3d 901, 905 (Fla. 2020). This focus does not appear to conflict with the text's plain meaning, even if there is disagreement as to the ultimate conclusion in a particular case.

Justice Francis claims that our precedent on the single-subject requirement has been erratic, which may be true. Though greater consistency is a laudable goal, I do not think that adopting a more restrictive approach guarantees achievement of that goal, especially when broad terms still exist under her formulation of the test. Moreover, based on my reading of the text, I do not believe that our precedent in this regard can be viewed as *clearly* erroneous, even if one might prefer what Justice Francis describes as a less "malleable" interpretation.

Additionally, we have viewed the single-subject provision's chief purpose as preventing separate matters being combined into a single initiative to aggregate votes or secure approval of an unpopular issue, otherwise known as "logrolling." *See, e.g., Evans v. Firestone*, 457 So. 2d 1351, 1354 (Fla. 1984) (characterizing *Fine* as "discuss[ing] the primary and fundamental concern of the one-subject restriction—the prevention of logrolling"); *Advisory Op. to Att'y Gen. re Prohibiting State Spending for Experimentation that Involves the Destruction of a Live Hum. Embryo*, 959 So. 2d 210, 212-13 (Fla. 2007); *All Voters Vote*, 291 So. 3d at 905. This, in my view, is compatible with the definitions noted above and with our case law's focus on whether all aspects of an amendment are related as part of a single dominant plan or scheme. No one has argued that our emphasis on this anti-logrolling rationale is out of place in a textually faithful analysis or that any other contextual or historical considerations apply.

Accordingly, based on the analysis above and supported by factually similar precedent as analyzed in the majority opinion, I agree that the provision does not violate the single-subject requirement.

FRANCIS, J., dissenting.

While I agree with Justice Sasso's dissenting opinion regarding the misleading nature of the ballot summary, I cannot join that dissent (or the majority) because I believe the ballot initiative *also* violates the single-subject requirement.

Our precedents adopted a broad reading of the single-subject requirement, a reading that this Court perpetuates in approving the amendment for the ballot.

But in requiring "but one subject and matter *directly* connected therewith," article XI, section 3's plain text requires a narrow reading, one where there is no daylight between the subject and matter. (Emphasis added.)

One need only review the relevant definitions to understand why. Those relevant definitions are of "subject," "connected," "one," "matter," and "directly," and they should be read together in context. I agree with the concurrence's definitions of "subject" ("topic") and "connected" ("united" or "related"). *See* concurring op. at 21-22 (Grosshans, J.). The word "one" means "being a single unit or entire being or thing and no more"; "existing alone in a specified sphere[; for example,] there is [one] apple in the basket."

*One*, *Webster's Third New International Dictionary* 1575 (1961, rev. 1981, unabridged); *see also Single, Black's Law Dictionary* 1665 (11th ed. 2019) ("Consisting of one alone; individual"). And "matter" is defined as "the substance of a branch of knowledge"; "something (as information or a topic of discussion) of a particular nature or involving a particular and often specified thing or relation"; "something of an indicated kind or having to do with an indicated field or situation." *Matter*, *Webster's Third New International Dictionary* 1394 (1961, rev. 1981, unabridged).

But, in context, article XI, section 3's use of the word "directly" modifies the verb "connected" to describe how the nouns "subject" and "matter" must be "connected" (i.e., "directly"). Thus, "directly" is used as an adverb. In turn, the adverb "directly" means:

> straight on along a definite course without deflection or slackening . . . purposefully or decidedly and straight to the mark . . . in a straightforward manner without hesitation, circumlocution, or equivocation: plainly and not by implication . . . in unmistakable terms: unqualifiedly[; for example,] deals [directly] with the stated purpose of the book . . . without divergence from the source or the original . . . .

*Directly*, *Webster's Third New International Dictionary* 641 (1961, rev. 1981, unabridged).

Defining "directly" this way, to me, makes the most sense in the context of the constitutional text. Why? Because alternative definitions require the reader to make *additional* inferential leaps outside of the written words and their context.

Consider, for instance, the two alternative definitions of "direct" offered by the concurrence. The first alternative defines "direct" as possibly meaning that which is "characterized by [a] . . . causal, or consequential relationship." Concurring op. at 21-22 (Grosshans, J.). But the fuller text of article XI, section 3 provides that "any such revision or amendment . . . shall embrace but one subject and matter directly connected therewith." This reflects a presumption that the subject and connected matters are being proposed at one time and together—*simultaneously*—in the same proposed revision or amendment. There is simply nothing in the language of article XI, section 3 supporting a cause-and-effect relationship between the "one subject" and "matter directly connected therewith."

The second alternative proposed definition of "directly" as a "close logical relationship" also misses the mark. Many matters may logically relate to a topic either implicitly or explicitly. But

given that the proposed amendment must "embrace but one subject," which cannot be defined by the proposed amendment's broader purpose(s), *see Franklin v. State*, 887 So. 2d 1063, 1077-78 (Fla. 2004) (quoting *Gibson v. State*, 16 Fla. 291, 299 (1877)),[10] "directly" must mean that other logically related matters addressed in the proposed amendment must be very closely related to the one subject or topic (i.e., a matter must be *unequivocally* and *plainly, not implicitly* related to the subject).

Applying the contextually informed definitions above, the single-subject requirement of article XI, section 3, then, would be read and understood like this: the proposed amendment must "embrace but **one** [*'a single unit or entire being or thing and no more . . . existing alone in a specified sphere'*] **subject** [*'topic,' not the proposed amendment's purpose or purposes*] and **matter** [*'something (as information or a topic of discussion) of a particular*

---

10.  Because the single-subject requirement in the citizen initiative context is *narrower* than the one in the legislative context, *see Franklin*, 887 So. 2d at 1077-78 (quoting *Fine v. Firestone*, 448 So. 2d 984, 988-89 (Fla. 1984)), I assume the narrower reading of the term "subject" as non-synonymous with purpose in the legislative context applies with at least equal force in the citizen initiative context.

*nature or involving a particular and often specified thing or relation'*] **directly** [*'without equivocation,' 'straightforward,' 'plainly and not by implication,' and 'in unmistakable terms'*] **connected** [*'joined or linked'*] **therewith**."

This reading is a narrow one.  It means that in the context of the citizen initiative process, proposed amendments are *limited* to one topic (one item is in the figurative basket), and other matters addressed in the proposed amendment must be plainly and unequivocally linked to that one topic.

A narrow reading, I believe, best protects the people's right to self-governance by replacing the Court's nebulous "oneness of purpose" analysis with a straightforward, analytical framework for examining these proposed amendments.  By eliminating the malleable standard associated with "oneness of purpose"—the definition of which can change depending on the makeup of the Court,[11] and under which many subjects can be construed as one—

---

11.  "[T]he erratic nature of our own case law construing article XI, section 3 shows just how vague and malleable this 'oneness' standard is.  What may be 'oneness' to one person might seem a crazy quilt of disparate topics to another.  'Oneness,' like beauty, is in the eye of the beholder; and our conception of 'oneness' thus has changed every time new members have come

we both guard electoral integrity, and shift power back to the voters by ensuring they are presented with a proposal that is *not* "radically defective."[12] We also restore the power of voters to amend their governing document by retaining their "prerogative to separately decide discrete issues."[13]

This Court could rely solely on the text to recede from this broad reading based on clear error under *Poole*. *See* 297 So. 3d at

---

onto this Court." *Advisory Op. to Att'y Gen.—Ltd. Pol. Terms in Certain Elective Offs.*, 592 So. 2d 225, 231 (Fla. 1991) (Kogan, J., concurring in part, dissenting in part); *see also State v. Poole*, 297 So. 3d 487, 507 (Fla. 2020) (expressing wariness for tests that are "malleable and do not lend themselves to objective, consistent, and predictable application").

12. *See generally In re Advisory Op. to Att'y Gen. re Use of Marijuana for Certain Med. Conditions*, 132 So. 3d 786, 819-20 (Fla. 2014) (Canady, J., dissenting) ("One of the most important rights enjoyed by the people of Florida under our constitution is the right to vote on constitutional amendments proposed through the initiative process. That right and the initiative process are subverted when the voters are presented a misleading ballot summary. The integrity of the electoral process is seriously compromised by placing this proposed amendment on the ballot with a radically defective summary . . . .").

13. *See Ltd. Pol. Terms in Certain Elective Offs.*, 592 So. 2d at 231 (Kogan, J., concurring in part, dissenting in part).

507. But a review of the history behind this Court's broad "oneness of purpose" reading also reflects that it was built on shaky ground.

When the Court first applied the "oneness of purpose" test in *Floridians Against Casino Takeover v. Let's Help Florida*, 363 So. 2d 337, 340 (Fla. 1978), *Floridians* adopted Justice England's reasoning in his concurring opinion in *Weber v. Smathers*, 338 So. 2d 819 (Fla. 1976). In *Weber*, Justice England analyzed the *intent* behind the 1972 amendment to article XI, section 3 as an overall expansion of the power to either amend or revise the Florida Constitution by citizen initiative petition.[14] Justice England reasoned that the new limiting condition, that any such proposal must embrace a single subject, should be read as a "functional . . . *restraint* on the range of authorized amendments." 338 So. 2d at

---

14. Indeed, the text of the 1972 version clearly expanded the 1968 version of article XI, section 3 by providing for *both* the revision or amendment of "any portion or portions" of the Florida constitution, whereas the 1968 version limited such proposals to amendments of a single section. *See Adams v. Gunter*, 238 So. 2d 824 (Fla. 1970) (removing a ballot proposal to revise the bicameral legislature and create a unicameral legislature because the 1968 version of article XI, section 3 restricted citizen initiative petitions to *amend* a single portion of the constitution, whereas the petition proposed *revising* multiple constitutional *provisions*).

823 (England, J., concurring) (emphasis added).  But he candidly noted that the Court had not been advised "what functional limitation might have been intended."  *Id.*  Turning to historical clues and the similar "but one subject" language applicable to the Legislature in article III, section 6, Justice England reasoned that the new single-subject requirement should be interpreted as it is in the legislative context, an interpretation that is quite broad.  *Id.*; *see also* art. III, § 6, Fla. Const.  Of course, Justice England did *not* address the intent behind the "matter directly connected therewith" language.

That concurrence was then mostly adopted by the Court's subsequent decision in *Floridians.*  363 So. 2d at 340.[15]  In *Floridians*, this Court agreed that the 1972 amendment was intended to expand the citizen initiative process.  *Id.*  And citing the

---

15.  *Floridians* also partly reaffirmed a test set out in *City of Coral Gables v. Gray*, 19 So. 2d 318 (Fla. 1944), that in determining whether a proposal addresses a single subject, the test is whether it "may be logically viewed as having a natural relation and connection as component parts or aspects of a single dominant plan or scheme.  Unity of object and plan is the universal test . . . ."  363 So. 2d at 339 (quoting *City of Coral Gables*, 19 So. 2d at 320); *see also Fine*, 448 So. 2d at 990 (explaining that this Court in *Floridians* partly reaffirmed the test set out in *City of Coral Gables*).

*Weber* concurrence, *Floridians* determined that the single-subject limitation should also be read broadly in line with this expansion, meaning that the subject and connected matters need only have "functional unity" and a "oneness of purpose." *Id.*

These judicial glosses not only have no support in the constitutional text, their use has also rendered the actual words— "directly"—as mere surplusage. Receding from our cases that employed this clear error would revive the full text and restore the single-subject requirement's clear constitutional function, as a restraint.[16]

---

16. *Cf. McDonald v. City of Chicago*, 561 U.S. 742, 805-13 (2010) (Thomas, J., concurring in part and concurring in the judgment) (agreeing that the city of Chicago's handgun ban was unconstitutional but advocating for reviving the Fourteenth Amendment's privileges and immunities clause as the "more straightforward" analysis that is also "faithful to the Fourteenth Amendment's text and history"; explaining that the Court's post-Civil war precedent interpreting the Fourteenth Amendment so narrowed the "privileges and immunities" clause that litigants turned to the due process clause, which ultimately led to the concept of "substantive due process" and the Court's reliance on "tests" for determining state violations of citizens' fundamental rights; and advocating for reviving the privileges and immunities clause, saying, "I believe this case presents an opportunity to reexamine, and begin the process of restoring, the meaning of the Fourteenth Amendment agreed upon by those who ratified it.").

As it relates to this case, personal use and commercialization of marijuana aren't even two sides of the same coin.  If the matters directly connected to the "subjects" are different, it's plain to me that the subjects themselves are different.

At bottom, using marijuana as an individual and growing it for commercial sale and consumption implicate different criminal and regulatory schemes.

The proposed amendment grafts in a new *personal* right to use *recreational,* non-medical marijuana in Florida and removes criminal penalties for said personal use.[17]  Perhaps the Department of Health can continue to oversee this.  But the proposed amendment also adds a new right for certain commercial entities to *cultivate* (i.e., *grow*) recreational marijuana, which would traditionally come under the purview of Florida's Department of Agriculture[18] and is not directly (unequivocally) related to *personal*

---

17.  Currently, personal possession of 20 grams or less of cannabis is only subject to a misdemeanor penalty.  § 893.13(6)(b), Fla. Stat. (2023).

18.  *See, e.g.,* § 581.217, Fla. Stat. (2023) (permitting the cultivation and growth of hemp so long as compliant with

use.  And it adds a new right for certain entities to sell, manufacture, etc., trafficking amounts of recreational marijuana commercially,[19] which would now also involve the regulation of business entities by the Department of State and would require licensing by the Department of Business and Professional Regulation.[20]  None of these commercial regulations *directly* relates to the regulation or decriminalization of recreational marijuana for *personal* use; they relate directly to the *business* of growing and selling marijuana on a large scale.

---

provisions of statute; requiring that grower is licensed by the Department of Agriculture).

19.  Currently, possession of trafficking amounts of cannabis (in excess of 25 pounds or 300 plants) is punishable as a first-degree felony with minimum mandatory sentences and fines, which increase depending on the amount.  § 893.135(1), Fla. Stat. (2023).

20.  *See* § 561.02, Fla. Stat. (2023) ("There is created within the Department of Business and Professional Regulation the Division of Alcoholic Beverages and Tobacco, which shall supervise the conduct, management, and operation of the manufacturing, packaging, distribution, and sale within the state of all alcoholic beverages and shall enforce the provisions of the Beverage Law and the tobacco law and rules and regulations of the division in connection therewith." (footnote omitted)); § 569.0025, Fla. Stat. (2023) ("The establishment of the minimum age for purchasing or possessing, and the regulation for the marketing, sale, or delivery of, tobacco products is preempted to the state.").

Of course, it depends on how broadly you define a topic. But what if a proposal was just called "government"? Would a more limited single-subject requirement apply then? Aren't we incentivizing citizen groups to generalize their topics to such a degree they will always evade the single-subject limitation? Isn't this precisely what happened in *Weber*, which permitted five subjects to be rolled into one under the broad subject, "Ethics in Government"? These questions are the iceberg below the tip of our continued broadening of the single-subject rule, evoking the warnings of potential abuse Justice McDonald noted thirty years ago.[21]

---

21. Justice McDonald noted that the citizen initiative process had been abused in *Advisory Opinion to the Attorney General— Limited Marine Net Fishing*:

> [T]he legislative power of the state is vested in the Legislature, art. III, § 1, and on matters that are statutory in nature, a concerted effort should be made to have the Legislature address the subject. The technical requirements, such as the single-subject rule and the requirements of section 101.161(1), Florida Statutes (1991), *appear insufficient to prevent abuse of the amendment process*. At this juncture, rather than espouse any particular solution as to how to prevent such abuse, I merely express my thought that some

Here, the most concerning forms of abuse of process are not directly implicated; the Sponsor did not submit the amendment under the general topic "legalization of marijuana."  The Sponsor selected a narrower subject here instead, entitling the proposed amendment "Adult Personal Use of Marijuana."  This title explicitly states that the ballot proposal is about the "personal use" of adult recreational marijuana, not a company's ability to supply large amounts of marijuana to those persons.[22]  Commercialization is a tangential topic, not a *direct*, unequivocally connected matter to legalizing the *personal use* of marijuana.

But if the single-subject requirement means anything, it must act as a *restraint* or *limit* on the power to revise or amend multiple provisions of the Florida Constitution, as is plainly stated by article XI, section 3.  Otherwise, the power to revise our governing

---

issues are better suited as legislatively enacted statutes than as constitutional amendments.

620 So. 2d 997, 1000 (Fla. 1993) (McDonald, J., concurring) (emphasis added) (footnote omitted).

22.  I would conclude the title is misleading as well given that the actual proposed amendment language reaches well beyond simply providing for *personal* use of recreational marijuana by adults.

document is really in the hands of a few interested groups that may not have the interests of all Floridians in mind. But they can, at least, be required to clear the strict constitutional hurdle article XI, section 3 plainly provides.

For these reasons, I respectfully dissent.

SASSO, J., dissenting.

I agree with the majority's conclusion that the initiative in this case does not violate the single-subject requirement based on our existing precedent. However, I believe the Sponsor has failed to provide a ballot summary in "clear and unambiguous language" as required by section 101.161, Florida Statutes (2023). In three places, the Sponsor chose to use the word "allows" to describe the legal effect of the initiative. But in choosing that language, the Sponsor twice misleads voters as to what the initiative would accomplish. For that reason, I conclude that the proposed initiative is precluded from being placed on the ballot and therefore respectfully dissent.

Section 101.161(1) imposes "certain clarity requirements for ballot titles and summaries." *Advisory Op. to Att'y Gen. re Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing,*

*& Other Restrictions*, 320 So. 3d 657, 667 (Fla. 2021); *see also*

§ 101.161(1), Fla. Stat. (providing that "a ballot summary of such

amendment or other public measure shall be printed in *clear and*

*unambiguous language* on the ballot" (emphasis added)).  This

Court has therefore derived from the statute's text two requirements

the sponsor must fulfill in preparing the ballot summary: 1) the

summary must not mislead the public and 2) the ballot summary

must fairly inform the voter of the chief purpose of the amendment.

*See Fla. Dep't of State v. Slough*, 992 So. 2d 142, 147 (Fla. 2008)

(quoting *Advisory Op. to Att'y Gen. re Prohibiting State Spending for*

*Experimentation that Involves the Destruction of a Live Hum.*

*Embryo*, 959 So. 2d 210, 213-14 (Fla. 2007)).  Failure to meet either

requirement is fatal.  *See Detzner v. League of Women Voters of Fla.*,

256 So. 3d 803, 808 (Fla. 2018) ("A proposed amendment must be

removed from the ballot when the summary does not accurately

describe the scope of the text of the amendment, because it has

failed in its purpose.").

    My assessment of this case implicates the first requirement—

that the ballot summary may not mislead voters.  This requirement

is critical because it ensures voters receive "fair notice of the

content of the proposed amendment" so that they "will not be misled as to [the proposed amendment's] purpose, and can cast an intelligent and informed ballot." *Advisory Op. to Att'y Gen. re Right of Citizens to Choose Health Care Providers*, 705 So. 2d 563, 566 (Fla. 1998) (quoting *Advisory Op. to Att'y Gen.—Fee on Everglades Sugar Prod.*, 681 So. 2d 1124, 1127 (Fla. 1996)). In fulfilling this requirement, the sponsor "need not explain every detail or ramification of the proposed amendment." *Advisory Op. to Att'y Gen. re Prohibiting Pub. Funding of Pol. Candidates' Campaigns*, 693 So. 2d 972, 975 (Fla. 1997). But when the sponsor chooses to include language in a ballot summary, accuracy is key. *See Advisory Op. to Att'y Gen. re Protect People, Especially Youth, from Addiction, Disease, & Other Health Hazards of Using Tobacco*, 926 So. 2d 1186, 1194 (Fla. 2006) (noting ballot summaries "must be accurate").

Here, the ballot summary misleads voters in two ways. The first, and most egregious, is the Sponsor's decision to claim that the initiative "allows" "other state licensed entities" to enter the marijuana market when the initiative does no such thing. Specifically, the summary says the initiative:

- 41 -

*allows* Medical Marijuana Treatment Centers, and *other state licensed entities*, to acquire, cultivate, process, manufacture, sell, and distribute such products and accessories.

(Emphasis added.)

The word "allows" has differing meanings and can be applied at differing levels of generality, so I will start by explaining what I conclude the word "allows" means in this context.[23] And in context, the summary uses the word "allows" twice before the phrase "other state licensed entities" appears. It appears three times throughout the ballot summary in total, presumptively carrying the same meaning throughout. Each time, the word "allows" appears before some right the initiative ostensibly confers. That context confirms that the use of "allows" throughout the summary means "[t]o recognize as a right or privilege; to accord as a legal entitlement." *Black's Law Dictionary* 95-96 (11th ed. 2019). In other words, the use of the word "allows" in context suggests that the amendment

---

23. This Court has used traditional tools of interpretation to assist in determining how voters will understand ballot summaries. *See, e.g., Advisory Op. to Att'y Gen. re Adult Use of Marijuana*, 315 So. 3d 1176, 1180-81 (Fla. 2021); *Regulate Marijuana in a Manner Similar to Alcohol to Establish Age, Licensing, & Other Restrictions*, 320 So. 3d at 668-69.

itself does the work—that the amendment itself would generate some specific right.

The colloquial definition of "allows" reinforces that specific meaning in all three clauses. *See American Heritage Dictionary of the English Language* 48 (5th ed. 2011) (defining "allow" to mean "[t]o permit the presence of" or "[t]o let do or happen; permit"). And my conclusion that "allows" would signal to voters that the amendment itself accords some specific right is made even more evident when contrasted with additional language in the same ballot summary. When attempting to explain the impact of federal law, for example, the ballot summary states the initiative "does not change . . . federal law."

Choosing the word "allows" is misleading in context because the amendment itself does not "allow" "other state licensed entities" to sell marijuana. Instead, and as the full text of the initiative provides, there is an intervening step that may never materialize: the Legislature must decide to provide for the licensure of "other" entities first.

Proposed article X, section 29(e) says, "The legislature *may* provide for the licensure of entities that are not [MMTCs] to" sell

marijuana products. (Emphasis added.) As a proponent concedes, "if the Legislature does nothing, MMTCs will remain the only entities legally entitled to cultivate and distribute marijuana." Answer Brief of Medical Marijuana Business Association of Florida in Support of the Initiative at 18. Thus, it is inaccurate to say that the amendment also "allows" "other" entity sales. *See Advisory Op. to Att'y Gen. re Right to Competitive Energy Mkt. for Customers of Inv.-Owned Utils.*, 287 So. 3d 1256, 1260-61 (Fla. 2020) (noting that the question was not whether a person had the right to sell electricity if the initiative was adopted, but whether, as the ballot summary claimed, the initiative granted that right, and concluding that the ballot summary was affirmatively misleading for creating the impression that the initiative granted a right).

The misleading nature of "allows" in this context presents more than a mere technical, or immaterial, violation of the statutory clarity requirements. Indeed, Floridians have expressed concern that existing medical marijuana markets stifle competition and give the MMTCs monopolies. *See, e.g.*, *Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1113-15 (Fla. 2021) (discussing affidavits related to "difficulties in finding the products [consumers] need,

high prices when they do find the products they need, and lack of knowledge and professionalism in MMTC employees they have dealt with"). So rather than being forthcoming with voters and explaining that the Legislature may choose to replicate the medical marijuana market by limiting entities that may sell marijuana to MMTCs, the ballot summary instead suggests that the initiative affirmatively "allows" other state licensed entities to sell. In reality, there are no "other state licensed entities" and there may never be "other state licensed entities" regardless of whether the initiative passes.[24]

This defect in the Sponsor's chosen language is enough to keep the amendment off the ballot, but there is a second, independent way in which the summary is misleading. The initiative misleads voters with its opening stanza when it says that it "*[a]llows* adults 21 years or older to possess, purchase, or use

_____

24. So the only sense in which the amendment "allows" other state licensed entities to sell marijuana is in the sense that it "does not prohibit" the Legislature from making a policy decision as to whether to allow entities other than MMTCs to sell marijuana. But in my view, ascribing that meaning to the word "allows" here would both fail to give the term its reasonable, ordinary meaning and ignore the context in which the term is used, particularly when the summary also says it "[a]llows consistent legislation" as something the amendment does unique from allowing other state licensed entities to sell marijuana.

- 45 -

marijuana products and marijuana accessories for non-medical personal consumption by smoking, ingestion, or otherwise." (Emphasis added.) That statement is false. A state has no power to authorize its residents to participate in conduct that would constitute a federal crime. *See* art. VI, cl. 2, U.S. Const.; *cf. United States v. Aquart*, 912 F.3d 1, 60-61 (2d Cir. 2018). Consequently, this initiative does not "allow" anything. Instead, whether Floridians are "allowed" to possess marijuana for recreational use will depend on the federal government.

The only remaining question then is whether the Sponsor made up for the falsity of this statement by including a subsequent statement (after intervening clauses) that the initiative "[a]pplies to Florida law; does not change, or immunize violations of, federal law." In my view, the Sponsor failed in its endeavor.

Read together with "allows," which again is used in the affirmative sense, voters will likely attempt to harmonize the two clauses. In doing so, they would be misled into concluding that marijuana use will be legal in Florida, either because the amendment is consistent with federal law or because there is some subset of marijuana that Floridians will be allowed to use without

penalty. That will not be the case even if the amendment passes. *See Advisory Op. to Att'y Gen. re Adult Use of Marijuana*, 315 So. 3d 1176, 1181 (Fla. 2021) (noting a marijuana user in Florida would "remain exposed to potential prosecution under federal law").

It would be astonishingly simple to state what the amendment actually does in a straightforward and upright way.[25] But the Sponsor chose not to do so, including the misleading statement instead. For that independent reason, I conclude the ballot summary fails, and I respectfully dissent.

Original Proceeding – Advisory Opinion – Attorney General

Ashley Moody, Attorney General, Henry C. Whitaker, Solicitor General, Jeffrey Paul DeSousa, Chief Deputy Solicitor General, and Daniel W. Bell, Chief Deputy Solicitor General, Tallahassee, Florida,

 for Petitioner

Alan Lawson, Jason Gonzalez, Jessica Slatten, and Samuel J. Salario, Jr., of Lawson Huck Gonzalez, PLLC, Tallahassee, Florida,

 for Interested Party, Florida Chamber of Commerce

Jeremy D. Bailie of Weber, Crabb & Wein, P.A., St. Petersburg, Florida,

 for Interested Party, Drug Free America Foundation

---

25. For example, the Sponsor could say the initiative "prohibits state law penalties."

Joshua Katz and Anastasia Boden of Cato Institute, Washington, District of Columbia; and Spencer George of the Law Office of Spencer George, Chuluota, Florida,

      for Interested Party, Cato Institute

Jonathan S. Robbins, Zachary R. Kobrin, and Scott Miller of Akerman LLP, Fort Lauderdale, Florida,

      for Interested Party, Medical Marijuana Business Association of Florida, Inc., a Florida Corporation

Glenn Burhans, Jr. of Stearns Weaver Miller, Tallahassee, Florida; Barry Richard of Barry Richard Law Firm, Tallahassee, Florida; Dan Humphrey of Quinn Emanuel Urquhart & Sullivan, LLP, Miami, Florida; John F. Bash of Quinn Emanuel Urquhart & Sullivan, LLP, Austin, Texas; Ellyde R. Thompson of Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York; and Rachel G. Frank of Quinn Emanuel Urquhart & Sullivan, LLP, Washington, District of Columbia,

      for Interested Party, Smart & Safe Florida

Daniel B. Tilley of American Civil Liberties Union Foundation of Florida, Inc., Miami, Florida,

      for Interested Party, American Civil Liberties Union of Florida, Inc.